Opinion issued February 12, 2009


















In The
Court of Appeals
For The
First District of Texas




NO. 01-05-00141-CR




CODY LEE OURSBOURN, Appellant

v.

THE STATE OF TEXAS, Appellee




On Appeal from the 351st District Court
Harris County, Texas
Trial Court Cause No. 969321




O P I N I O N 

          A jury found appellant, Cody Lee Oursbourn, guilty of aggravated robbery.


 
The jury also found the allegations in an enhancement paragraph to be true and
assessed appellant’s punishment at 75 years in prison. 
          This Court affirmed the trial court’s judgment on original submission. See
Oursbourn v. State, 251 S.W.3d 552, 559 (Tex. App.—Houston [1st Dist.] 2006, pet.
granted). On appellant’s petition for discretionary review, the Texas Court of
Criminal Appeals reversed our judgment holding that the trial court erred by failing
to give the jury an article 38.22 section 6 “general” voluntariness instruction, relating
to appellant’s inculpatory videotaped statement. See Oursbourn v. State, 259 S.W.3d
159, 182 (Tex. Crim. App. 2008); see also Tex. Code Crim. Proc. Ann. art. 38.22,
§ 6 (Vernon 2005). The Court of Criminal Appeals has remanded the case for us to
review the impact of the instruction’s omission under Almanza’s egregious harm
standard. See Oursbourn, 259 S.W.3d at n.89; see also Almanza v. State, 686 S.W.2d
157, 171 (Tex. Crim. App. 1985).
          After conducting the harm analysis, we reverse and remand. 
                                                        Background
          One night in November 2003, Frances Rapp and her friends planned to
celebrate her twenty-first birthday at a Houston nightclub. Rapp and her friend,
Brendon Martin, rode in Rapp’s Impala and parked near the club at about 9:45 p.m. 
After they got out of the Impala, Rapp and Martin were approached by a “light-skinned,” “white” or “Hispanic,” man wearing dark clothing, gloves, and a “beanie”
on his head. The man shoved a handgun in Rapp’s stomach and demanded the keys
to the Impala. Rapp complied, and the man drove off in her car. 
          Rapp’s Impala was equipped with “On-Star,” a tracking and communications
system. After the robbery, Rapp called the police and On-Star. Later that night, at
3:30 a.m., On-Star located the Impala at an apartment complex. The police went to
the complex and watched the Impala until someone—later determined to be
appellant—drove off in the car. The police initiated a traffic stop, but appellant sped
off, leading police on a short chase. Appellant then stopped the car, got out, and ran
with the police in pursuit. While attempting to cross a bayou, appellant slipped and
hit his head on a rock. After he was taken into custody, appellant was transported to
the hospital for treatment for the injuries he had received during the chase. 
          The police contacted Rapp and received permission to search the Impala. 
Inside the car’s console, the police found a pair of black gloves. 
          Two days later, HPD Investigator C. Guidry showed a photo lineup, which
contained appellant’s photograph, to Rapp, Martin, and another witness, Olivia
Martinez. Rapp, Martin, and Martinez did not identify appellant as the car-jacker. 
Instead, each witness chose another person from the photo lineup as the assailant. 
          Because the witnesses could not identify appellant, Investigator Guidry decided
to conduct a custodial, videotaped interview with appellant. Investigator Guidry
began the interview by reading appellant his statutory rights. At the time of the
interview, appellant was wearing a neck brace, which somewhat impaired his ability
to communicate. Initially, appellant was not very communicative with Investigator
Guidry but did indicate that he waived his rights and agreed to a videotaped
interview. At the time of the interview, Investigator Guidry was not aware that
appellant suffered from bipolar disorder.
          At first, appellant denied being at the club where the robbery occurred. Officer
Guidry then lied to appellant and told him that witnesses had picked him out of a
photo spread and had said that he had a gun. Appellant then admitted to the car
jacking but denied having a gun. Appellant stated that the witnesses might have
thought that he had a gun because he was wearing dark gloves, and he is unable to
flex his index finger. 
          During the interview, appellant complained of head pain. Investigator Guidry
told appellant that she did not doubt he was in pain and commented on the large lump
on appellant’s head. 
          One week later, Rapp and Martin viewed a live lineup, which included
appellant. As in the photo lineup, Rapp and Martin did not identify appellant as the
assailant. Instead, they each picked other men as the assailant. Witness Martinez was
not available to view the live lineup.
          A grand jury indicted appellant for aggravated robbery. The trial court ordered
a competency evaluation by court-appointed psychologist, Dr. Edward Friedman. Dr.
Friedman initially met with appellant on January 29, 2004. Because appellant was
so depressed that he was non-verbal, Dr. Friedman concluded that appellant was not
competent to stand trial. Appellant was admitted to the hospital for observation and
treatment. Dr. Friedman met with appellant three more times during the year and
ultimately concluded that appellant was competent to stand trial.
          After he was found competent, appellant filed a motion to suppress the
videotaped statement. In support of the motion, appellant alleged that “he was not
competent to understand his rights and knowingly and voluntarily waive his rights to
make the statement.” 
          The State called Dr. Friedman to testify at the motion to suppress hearing. The
doctor testified that, in his opinion, appellant was “competent” when he gave his
videotaped statement. Dr. Friedman acknowledged that “initially [appellant] was
fairly uncommunicative with the police officer who was interviewing him, just as he
had been with me [during the doctor’s initial interview with appellant when he found
appellant to be incompetent].” The doctor testified that, although appellant appeared
depressed at the start of the taped interview, appellant later appeared “very motivated
to present himself in a favorable light.” This indicated to Dr. Friedman that appellant
“wasn’t that depressed.” The doctor acknowledged that persons with bipolar disorder
“might have problems evaluating their constitutional rights and making a proper
choice as to what to do with those in mind.” But, the doctor added, this was true only
if the person was so depressed that he did not care what happened to him.
          The trial court denied appellant’s motion to suppress without making findings
of fact and conclusions of law. The case proceeded to trial. 
          At trial, appellant objected to the admission of the videotaped statement “on
the grounds that it’s not a voluntary statement. The Defendant [is] bipolar and was
incompetent to give consent.” The trial court overruled the objection and the
videotaped statement was admitted into evidence.
          Appellant also based his defense, in part, on his bipolar disorder. During his
opening statement, defense counsel argued that appellant had given a “false
confession” to protect his girlfriend’s relatives. Although no direct evidence was
presented of this defense theory during trial, the evidence did show that appellant
suffered from bipolar disorder and that appellant’s girlfriend lived at the apartment
complex where the Impala was initially located six hours after the robbery. 
          The defense called appellant’s mother to testify at trial. She told the jury that
appellant had been diagnosed with attention deficit disorder in elementary school and
was prescribed Ritalin. Appellant’s mother also testified that appellant was
diagnosed with bipolar disorder when he was 14 years old. She described appellant’s
mood swings related to his bipolar disorder. Appellant’s mother testified that, on the
day of the robbery, Saturday, November 22, 2003, she observed appellant to be in a
“manic” state. She stated that when she saw him in jail the Monday after the robbery,
appellant was still manic. 
          To rebut the testimony of appellant’s mother, the State called Dr. Friedman to
testify. Dr. Friedman testified that he saw the videotape, and he believed that
appellant voluntarily made the statement. In this regard, Dr. Friedman testified that,
although appellant appeared “depressed” on the videotape, he thought that “the
content of the videotape makes it clear that [appellant] was aware of what he was
doing and, you know, aware of whom he was giving the statement to.” 
          Dr. Friedman also acknowledged that he had found appellant not competent on
January 29, 2004. When asked why he had made that finding, the doctor explained:
At least I had a serious question about his competence. Because
even though I saw no sign that he was, you know, delusional,
hallucinating or in any other way out of touch with reality, he was acting
so depressed at that time that I really couldn’t get him to communicate
with me to any meaningful extent. And I was concerned that he was so
depressed that if he couldn’t communicate with me, perhaps he was so
depressed he couldn’t communicate with his attorney as well. 
And for that reason, I recommended that he be found incompetent
and committed to a state hospital for treatment. 
          When asked whether appellant’s “demeanor on the video interview was
different from the demeanor he had with [the doctor] on January the 29th,” Dr.
Friedman responded, “At the very beginning he was similarly, you know, kind of shut
down and, you know, acting withdrawn. But within a few minutes on the videotaped
interview with the police officer he began to talk very spontaneously, I thought.” Dr.
Friedman also informed the jury that when he met with appellant in July of 2004, he
believed that appellant was, because of appellant’s inpatient treatment, competent to
stand trial.
          On cross-examination, Dr. Friedman acknowledged that a person suffering
from bipolar disorder might not appreciate the consequences of his acts or be
motivated to help himself. The doctor also agreed that a person with bipolar disorder
might be more likely to make a false confession to protect someone because he would
not appreciate the consequences of making the confession. 
          In his closing, defense counsel again urged that appellant’s confession was
false, explaining to the jury that “a person with bipolar disorder might not have as
good an appreciation for the consequences of what would happen to him if he
protected somebody, say, with a false confession.” 
          The jury found appellant guilty of aggravated robbery and assessed his
punishment at 75 years in prison. Appellant appealed. Appellant acknowledged that
he had neither requested nor objected to the lack of an instruction regarding the
voluntariness of his videotaped statement to police. Nonetheless, appellant asserted
that the trial court had erred by failing to, sua sponte, instruct the jury regarding the
law of voluntariness of custodial statements. See Oursbourn, 251 S.W.3d at 557–59. 
          On original submission, in a two-to-one decision, this Court overruled
appellant’s challenge regarding the voluntariness instruction and affirmed the trial
court’s judgment. Id. at 559. The majority concluded that, under Posey v. State, the
trial court had no duty to give a voluntariness instruction because voluntariness of a
confession is a “defensive issue” for which the trial court had no duty to instruct the
jury. See id. at 557–59 (citing Posey, 966 S.W.2d 57, 60–61 (Tex. Crim. App. 1998)
(holding that trial court not is required to give instruction on defensive issue unless
defendant requested (or objected to lack of) such instruction)). 
          On appellant’s petition for discretionary review, the Court of Criminal Appeals
held that the trial court erred by failing to give the jury a “general” voluntariness
instruction, as set forth in Code of Criminal Procedure article 38.22, section 6. See
Oursbourn, 259 S.W.3d at 182 (citing Tex. Code Crim. Proc. Ann. art. 38.22 § 6). 
The court concluded that voluntariness of a statement is not a defensive issue. See
id. at 180–81. The court further concluded that article 38.22, section 6 requires a
general voluntariness instruction when a section 6 voluntariness issue has been raised
and litigated. Id. at 175–76. The court determined that, based on the evidence, a
reasonable jury could have concluded that appellant’s statement was not voluntary. 
See id. at 181. Because section 6 voluntariness was raised and litigated in this case,
appellant was entitled to a section 6 “general’ voluntariness instruction. See id. 
Accordingly, the jury in this case should have been instructed: “Unless the jury
believes beyond a reasonable doubt that the statement was voluntarily made, the jury
shall not consider such statement for any purpose nor any evidence obtained as a
result thereof.” See id. at 175. 
          The court of criminal appeals reversed this Court’s judgment and remanded the
case for this Court to determine what harm, if any, was caused by the omission of the
article 38.22, section 6 “general” voluntariness instruction. See id. at 182. More
precisely, the court directed us to determine the impact of the omission of the
instruction under Almanza’s egregious harm standard. See id. & n. 89 (citing Ellison
v. State, 86 S.W.3d 226, 228 (Tex. Crim. App. 2002)). 
Standard of Review
          Jury-charge error is egregiously harmful if it affects the very basis of the case,
deprives the defendant of a valuable right, or vitally affects a defensive theory. 
Stuhler v. State, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007) (citing Hutch v. State,
922 S.W.2d 166, 171 (Tex. Crim. App. 1996)). “Egregious” harm is present when the
case for conviction was actually made clearly and significantly more persuasive by
the error. See Saunders v. State, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991). 
          When conducting an egregious-harm review, we consider the entirety of the
jury charge itself, the evidence, including the contested issues and weight of the
probative evidence, the arguments of counsel, and any other relevant information
revealed by the trial record as a whole. See Stuhler, 218 S.W.3d at 719. We place 
no burden of proof or persuasion to show egregious harm on either the defendant or
the State. See Warner v. State, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008). Before
we can find egregious harm, the record must show that the defendant has suffered
actual, rather than merely theoretical, harm from the jury-charge error. See Almanza,
686 S.W.2d at 174. Here, we determine whether appellant suffered egregious harm
by analyzing the impact of the omission of the voluntariness instruction, not by
analyzing the impact of the admission of the videotaped statement. See Ellison, 86
S.W.3d at 228.
          With these principles in mind, we determine whether appellant was egregiously
harmed by the omission of the section 6 “general” voluntariness instruction. 
Harm Analysis
          As mentioned, appellant’s counsel argued to the jury that appellant’s
confession was not voluntarily given due to his bipolar disorder. In this regard, Dr.
Friedman, the State’s psychologist who found appellant incompetent to stand trial
following his first meeting with appellant and who testified that appellant was
competent when he gave his confession, testified that, at the beginning of the
interrogation, appellant exhibited symptoms of his bipolar disorder. Appellant’s
mother testified that, on the day of the offense and on the day of the interrogation,
appellant was “manic.” 
          At the time of interview, appellant also had a recent head injury and expressed
that he was in pain. Investigator Guidry acknowledged that appellant was in pain and
commented on the size of the lump on appellant’s head. 
          As noted by the Court of Criminal Appeals, a reasonable jury could have
concluded that, based on the evidence, appellant’s confession was not made
voluntarily. See Oursbourn, 259 S.W.3d at 181. The State relied on appellant’s
confession in its closing argument as evidence to support a guilty finding. Whether
appellant was unable to voluntarily waive his rights and give a voluntary confession
due to his mental illness was a contested issue at trial. 
          Here, the absence of a section 6 voluntariness instruction may have
communicated to the jury that it had no reason to question the voluntariness of the
confession. At a minimum, the lack of an instruction made it much less likely that the
jury even considered or deliberated about the voluntariness of the confession; an
issue, which, under the law, it should have considered. 
          Assuming it considered the voluntariness issue, the jury was without guidance
regarding how to evaluate appellant’s statement. The jury was unaware that it had to
apply a reasonable doubt standard when determining the voluntariness of appellant’s
statement. See Tex. Code Crim. Proc. Ann. art. 38.22, § 6. And, by failing to give
a section 6 “general” voluntariness instruction, the State was relieved of meeting this
burden. Even if it doubted the voluntariness of appellant’s confession, the jury was
also unaware of the effect of an involuntariness finding; that is, it was unaware that
it could not consider the statement for any purpose if it found the statement to be
involuntary. See id. As a result, appellant’s voluntariness defense was undercut. 
          With respect to the jury charge as a whole, the State contends that the charge
contained a provision that served to ameliorate the lack of the section 6 voluntariness
instruction. The State points to the charge’s instruction to the jury that it was the
exclusive judge of the facts proved, of the credibility of the witnesses, and of the
weight to be given to the witnesses’ testimony. The State contends that, by following
that instruction, the jury could have disregarded Dr. Friedman’s and Investigator
Guidry’s testimony, which supported a finding that appellant’s confession was
voluntary. 
          Contrary to the State’s position, any ameliorative effect that the general
instruction arguably may have had would have been slight. The general instruction
did not direct the jury to consider the issue of voluntariness specifically, offered no
guidance for the standard by which to evaluate the voluntariness of the confession,
and provided no mechanism for disregarding the statement. Arguably, the general
instruction cited by the State could have misled the jury to believe that the only
evaluation to be made relating to appellant’s statement was one of credibility, not one
of voluntariness. 
          A review of the entire record also reveals that, during voir dire, the trial judge 
touched on the topic of a jury’s consideration of a defendant’s statement. The judge
told the venire that a defendant must voluntarily waive his rights before making a
statement. He further told the venire that, “generally speaking,” he, the judge,
decided whether a statement was admissible. The judge informed the venire that, if
a statement was admitted into evidence, the jury should consider the statement “just
like you consider all the rest of the evidence. You decide if you believe it or not, but
if it’s out there, it’s part of the evidence.” Such statement may have misled the jury
or distracted it from engaging in an evaluation of the voluntariness of appellant’s
statement, and did not ameliorate the lack of the voluntariness instruction. 
          The State also argues that the lack of the voluntariness instruction did not
egregiously harm appellant because sufficient evidence was admitted to establish
appellant’s guilt, aside from the confession. In this regard, the State points to the
following: (1) witness Olivia Martinez identified appellant in court as the assailant;
(2) appellant was in possession of Rapp’s car “mere hours” after the robbery; (3)
appellant fled from the police; (4) the On-Star system in the car had been tampered
with; (5) gloves similar to those worn by the assailant were found in the car; and (6)
appellant was wearing a dark shirt, which is what the witnesses stated the assailant
was wearing.
          We make the following observations regarding the evidence. 
          Witnesses Rapp and Martin identified other people as the assailant in both the
photo lineup and the live lineup. Witness Martinez identified another person as the
assailant when she viewed the photo lineup. Martinez was unavailable for the live
lineup. Martinez identified appellant in court when she was on the witness stand and
appellant was seated at the defense table. 
          The evidence also showed that at least six hours had passed between the time
of the robbery and when the Impala was located at the apartment complex of
appellant’s girlfriend. The evidence further showed that appellant was not wearing
the gloves when he was caught by police; the gloves were found in the car’s console. 
Significantly, other than Martinez’s in-court identification, the only direct evidence
of appellant’s guilt was his confession. 
          While it may have been sufficient to support appellant’s conviction, the
circumstantial evidence cited by the State was not so strong or overwhelming to
render the impact of the instruction’s omission harmless. 
          After reviewing the entirety of the jury charge, the evidence, including the
contested issues and weight of the probative evidence, the arguments of counsel, and
other relevant information revealed by the trial record as a whole, we conclude that 
the omission of the voluntariness instruction vitally affected a defensive theory and
the very basis of the case. See Hutch, 922 S.W.2d at 171. In addition, the State’s
case for conviction was made clearly and significantly more persuasive by the error. 
See Saunders, 817 S.W.2d at 692. We hold that appellant suffered egregious harm
as a result of the omission of the section 6 “general” voluntariness instruction. 
 

Conclusion
          We reverse the judgment of the trial court and remand the case for further
proceedings.



 

                                                             Laura Carter Higley
                                                             Justice

Panel consists of Justices Jennings, Higley, and Duggan.




Publish. See Tex. R. App. P. 47.2(b).