ACCEPTED
01-15-00268-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
10/5/2015 6:22:42 PM
CHRISTOPHER PRINE
CLERK

## NO. 01-15-00268-CR

### IN THE COURT OF APPEALS
### FOR THE FIRST DISTRICT OF TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
10/5/2015 6:22:42 PM
CHRISTOPHER A. PRINE
Clerk

### TONI TAVAREZ
*Appellant*

**v.**

### THE STATE OF TEXAS
*Appellee*

On Appeal from Cause Number 1450059
From the 177th District Court of Harris County, Texas

### BRIEF FOR APPELLANT

**ORAL ARGUMENT REQUESTED**

**ALEXANDER BUNIN**
Chief Public Defender
Harris County, Texas

**DAUCIE SCHINDLER**
Assistant Public Defender
Harris County, Texas
TBN 24013495
1201 Franklin, 13th Floor
Houston, Texas 77002
Phone: (713) 368-0016
Fax: (713) 368-9278

**Counsel for Appellant**

1

## IDENTITY OF PARTIES AND COUNSEL

Appellant

Ms. Toni Tavarez
TDCJ No. 01985672
William P. HobbyUnit
742 FM 712
Marlin, Texas 76661

Defense Counsel at Trial

Mr. R.P. "Skip" Cornelius
SBOT No. 04831500
2028 Buffalo Terrace
Houston, Texas 77019

Prosecutor at Trial

Ms. Keri Fuller
Ms. Sunni Mitchell
*Assistant District Attorneys*
*Harris County*
1201 Franklin Street, 6th Floor
Houston, Texas 77002

Presiding Judge

Honorable Ryan Patrick
177th District Court
1201 Franklin Street, 19th Floor
Houston, Texas 77002

Appellant's Counsel

Ms. Daucie Schindler
*Assistant Public Defender*
Harris County
1201 Franklin Street, 13th Floor
Houston, Texas 77002

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL.................................................................2

TABLE OF CONTENTS ........................................................................................3

TABLE OF AUTHORITIES ...................................................................................4

STATEMENT OF THE CASE .................................................................................5

ISSUE PRESENTED ............................................................................................5

STATEMENT OF FACTS .....................................................................................6

SUMMARY OF THE ARGUMENT.........................................................................17

ISSUE ONE ......................................................................................................18

    THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO SUSTAIN MS. TAVAREZ' CONVICTION FOR THE OFFENSE OF FELONY MURDER WHERE THE EVIDENCE FAILED TO ESTABLISH THAT SHE CAUSED THE DEATH OF THE COMPLAINANT.

ISSUE TWO ......................................................................................................21

    THE TRIAL COURT ERRED IN FAILING TO INCLUDE A GENERAL VOLUNTARINESS INSTRUCTION IN THE JURY CHARGE AS REQUIRED BY TEX. CODE CRIM. PROC. ART. 38.22§6.

PRAYER ...........................................................................................................25

CERTIFICATE OF COMPLIANCE ........................................................................26

CERTIFICATE OF SERVICE................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985)...................................................23

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010)...................................................19

*Burks v. United States,* 437 U.S. 1 (1978). .......................................................................21

*Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996).................................................19

*Contreras v. State*, 312 S.W.3d 566 (Tex. Crim. App. 2010).............................................18

*Creager v. State*, 952 S.W.2d 852 (Tex. Crim. App. 1997)...............................................23

*Greene v. Massey*, 437 U.S. 19 (1978)..............................................................................21

*Jackson v. Virginia*, 443 U.S. 307 (1979) ..................................................................... 18, 19

*Jackson v. State*, 652 S.W.2d 415 (Tex. Crim. App. 1983).................................................20

*Moore v. State*, No. 14-07-00366-CR, 2008 WL 4308424 (Tex. App. -Houston [14th Dist.] Aug. 28, 2008, pet. dism)...................................................................................................23

*Ngo v. State*, 175 S.W.3d 738 (Tex. Crim. App. 2005)....................................................24

*Oursbourn v. State*, 259 S.W.3d 159 (Tex. Crim. App. 2008). ................................... 22, 23

*Oursbourn v. State*, 288 S.W.3d 65 (Tex. App. -Houston [1st Dist.] 2009, no pet.).....................24

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)...............................................................23

**Statutes**

Texas Code Crim. Proc Art. 38.22.....................................................................................21

Texas Penal Code §19.02..................................................................................................18

Texas Penal Code §22.04..................................................................................................18

## STATEMENT OF THE CASE

Ms. Tavarez was charged by indictment with the offense of felony murder on December 1, 2014. The State alleged three alternative manner and means in the commission of the offense that was alleged to have occurred on June 18, 2012. (C.R. at 9). On March 5, 2015, she entered a plea of not guilty and proceeded to trial by jury. (4 R.R. at 8). On March 11, 2015, the jury found Ms. Tavarez guilty of felony murder as charged. (C.R. at 329). After a hearing on punishment, the jury sentenced Ms. Tavarez to serve fifty (50) years in the Institutional Division of the Texas Department of Criminal Justice. (C.R. at 339). Ms. Tavarez filed timely notice of appeal. (C.R. at 343). Undersigned counsel, Daucie Schindler, of The Harris County Public Defender's Office was appointed to represent Ms. Tavarez on March 13, 2015. (C.R. at 345).

## ISSUES PRESENTED

### ISSUE ONE

THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO SUSTAIN MS. TAVAREZ' CONVICTION FOR THE OFFENSE OF FELONY MURDER WHERE THE EVIDENCE FAILED TO ESTABLISH THAT SHE CAUSED THE DEATH OF THE COMPLAINANT.

### ISSUE TWO

THE TRIAL COURT ERRED IN FAILING TO INCLUDE A GENERAL VOLUNTARINESS INSTRUCTION IN THE JURY CHARGE AS REQUIRED BY TEX. CODE CRIM. PROC. ART. 38.22§6.

5

## STATEMENT OF FACTS

Dr. Rebecca Girardet, a child abuse pediatrician and the Director of the Child Protection Team at Children's Memorial Hermann Hospital, was working in mid-June, 2012, when Bayshore Medical Center sent a 19 month old patient named Y.T. to Children's Memorial Hermann Hospital. (4 R.R. at 13-20). When she arrived, Y.T. was unresponsive and demonstrating signs of brain death. She was completely dependent on a respirator to stay alive. Y.T. underwent emergency surgery to relieve pressure on her brain, but she had multiple severe skull fractures and a lot of blood within the brain tissue so her condition did not improve and she died on June 20, 2012. (4 R.R. at 21-26).

Dr. Girardet obtained a history from the Y.T.'s mother, the Appellant herein, Ms. Tavarez. Ms. Tavarez indicated that Y.T. had been acting and eating normally earlier that same day, but after returning from an errand she noticed the child was rubbing her head and her eye. Thinking that she was tired, Ms. Tavarez rocked Y.T. to sleep and put her down for a nap. Later, Y.T.'s older sister, A.T., told Ms. Tavaez that Y.T. was having trouble lifting her head so Ms. Tavarez tried to revive her by putting her in the shower. Shortly after the shower, Y.T. vomited so Ms. Tavarez placed her in the shower a second time in order to clean her off. After the second shower they determined Y.T. was not acting normal so they took her to the hospital at Bayshore. (4 R.R. at 27-28).

6

According to Ms. Tavarez, Y.T. had run into the corner of a door four days prior to having been hospitalized and suffered a bruise on her right temple, but she was unaware of any other trauma suffered by the child. However, the injuries that Y.T. exhibited were "tremendous" and inconsistent with a normal household injury. The injuries were consistent with the child's head having been slammed against a blunt object such as a table. (4 R.R. at 29-32). Dr. Girardet did not know what caused the injuries beyond the diagnosis of trauma to the head. (4 R.R. at 34).

Detective Enrique Guzman, with the Houston Police Department, received a call during the very early morning of June 19, 2012, to respond to a call at Children's Memorial Hermann Hospital. When he arrived he went to the pediatric intensive care unit and observed an injured child later identified as Y.T. Detective Guzman photographed the child (State's exhibits 1 through 8) and interviewed a nurse while Ms. Tavarez, the child's mother, was on the phone. After the nurse explained the child's injuries, Detective Guzman took Ms. Tavarez to an interview room and spoke to her for about twenty minutes. He thought that Ms. Tavarez seemed disconnected from what was going on. Ms. Tavarez told him that she had been alone with her children at her boyfriend's house when Y.T. awoke from a nap all sweaty and crying. Ms. Tavarez gave her a bath and she seemed better until about an hour later when she began crying again. At this point her boyfriend had returned home and he suggested they take the child to the hospital. (4 R.R. at 39-51).

7

Kimberly Deese, a registered nurse at Children's Memorial Hermann Hospital, was working in the pediatric intensive care unit in mid-June when Y.T. was admitted to the hospital. Y.T. was very sick with no purposeful movements and dependent on a respirator to breath. Ms. Deese introduced herself to Ms. Tavarez and inquired about what had happened to the child. Ms. Tavarez indicated that Y.T. had been running through the house a few days prior and hit her head on a door frame, but she seemed okay after wards and continued to play. Ms. Deese did not think that hitting her head on a doorframe seemed consistent with the injuries Y.T. had sustained. (5 R.R. at 6-17). Ms. Deese's notes indicated that:

> Mom stated that she laid down to take a nap at approximately 5:30 mp.m. and mom stated that her daughter came into the room and said the baby doesn't want to sit up. And mom said the patient had been up since 7:00 a.m. The patient ate breakfast but had not taken a nap all throughout the day. Mom stated that the patient looked exhausted and looked so hot, so I gave her a shower to cool her off and redressed her.

> Mom stated that she was holding her like a newborn, the patient, because she had no strength. Mom states that the boyfriend helped me. He got there to help me. Mom states that the boyfriend said let's take her to the hospital. Mom states that the patient was throwing herself back as if she was having a temper tantrum. Mom states that the boyfriend made the patient a bottle and gave it to her and she couldn't suck on it but states that she could hold it.

> Mom stated that last Thursday she was running with her brothers and hit the frame of the door. Mom stated hit the door, stepped back and then ran off.

> Mom states that on Saturday there was a barbecue to celebrate Father's Day early. Mom states the patient was fine. She was walking around okay. She was perfectly fine until Monday when my daughter brought her to me.

(5 R.R. at 22-24). Ms. Tavarez seemed unemotional until about noon when she was told by the doctors that Y.T. was declared dead at 8:27 that morning. Hearing that her daughter had been declared dead, Ms. Tavarez threw her head and fists down on the table and went out the door. (5 R.R. at 28). Ms. Tavarez remained at the hospital for approximately five hours following her notification of Y.T.'s death. (5 R.R. at 33).

Maria Tavarez testified that she met Toni Tavarez in middle school. Her brother, George, and Toni began a dating relationship and ultimately married. They have four children together, the youngest of which was Y.T.. However, her brother returned to Mexico when the children were very young. Maria had a birthday party for her son on June 15, 2012, and Toni agreed to drop off her children, including Y.T., for the party. Maria noticed that Y.T. had a bruise near her left eye, but she seemed fine otherwise and was acting normal. (5 R.R. at 37-44). Y.T. took a nap and ate food and cake that afternoon. Around 11:00 that night, Toni picked up her kids and Maria did not see or hear from her or he kids again until the following Monday when Toni called to tell her Y.T. was in the hospital. (5 R.R. at 55-58). Toni called back later to tell her Y.T. had blood on her brain and was being transferred to Texas Children's Hospital. Maria agreed to watch the other three children if Toni needed her to do so. When Toni told her that Y.T. was in a coma they both cried. Maria went to the hospital the next day and was there with other family members when the doctors informed them that Y.T. had died. (5 R.R. at 59-65).

9

Officer Brooke Taylor, with the Houston Police Department, was assigned to the Child Abuse Unit on June 19, 2012, when she received a call from Child Protective Services directing her to the pediatric ICU at Memorial Herman Hospital. After speaking with a few administrators and social workers at the hospital she went to see Y.T. According to Officer Taylor, Y.T. was intubated, wearing only a diaper and a bandage wrapped around her head. Ms. Tavarez, another female family member, and a nurse were all in the room with Y.T. at that time. Ms. Tavarez was standing at the head of the bed while the other female was crying and speaking Spanish. Ms. Tavarez agreed to an interview so Officer Taylor escorted her to an interview room where she recorded Ms. Tavarez' statement. (State's Exhibit 15). During the interview, Officer Taylor framed her questions in order to earn Ms. Tavarez' trust. Officer Taylor described Ms. Tavarez as unemotional and "matter-of-fact" in her responses to questioning. (5 R.R. at 76-94).

Ms. Tavarez indicated that she wanted to go to her boyfriend's house to take a shower. Officer Taylor, wanting to get into the residence to investigate, agreed to escort her there. Ms. Tavarez' boyfriend, Marc Teal, met them at his residence where Ms. Tavarez and her children had been living for the previous six months or so. Ms. Tavarez went inside with Marc while Officer Taylor waited outside for another patrol unit to arrive. Once the patrol officer arrived, they obtained consent and performed a video walk through of the residence. (State's Exhibit 18). Ms. Tavarez pointed out the door frame where Y.T. had hit her head a few days prior. Officer Taylor obtained a statement

10

from Ms. Tavarez' boyfriend, Mr. Teal, as well. Officer Taylor left Ms. Tavarez at Mr. Teal's residence. The next day, she was informed that the case had become a homicide so she turned over the proceeds of her investigation to the homicide unit assigned to the case. (5 R.R. at 95-105).

On June 27, 2012, the homicide officers contacted Officer Taylor and requested her assistance with the investigation. Ms. Tavarez had volunteered to come into the station so Officer Taylor went to assist with the interview. When she arrived at the station, Ms. Tavarez and Mr. Teal were already there. The two were separated and Officer Taylor watched on a monitor as other officers began to question Ms. Tavarez. Ms. Tavarez was sobbing. At one point, Officer Taylor was asked to assist with the interview so she entered the interrogation room and reintroduced herself to Ms. Tavarez. Unbeknownst to Officer Taylor, the video recording system was not operational during the first statement so she requested a second statement from Ms. Tavarez. Ms. Tavarez agreed and gave basically the same statement a second time, but this time with the video recording system in operation. (5 R.R. at 106-116; State's Exhibit 17).

Dr. Jennifer Love was working for the Harris County Institute of Forensic Sciences when she was asked to consult in an anthropological capacity in the death of Y.T. During the autopsy, she noticed that the skull was fractured. Some of the fractures appeared acute and others appeared to be older. The acute fractures were seen in the occipital area and through the base of the skull. The older fracture was of the mandible.

11

(6 R.R. at 6-12). The acute fractures were likely sustained no longer than about 48 hours before the time of death and appeared consistent with an impact to the back of the head. (6 R.R. at 26-27). The older fracture to the mandible was two to twelve weeks old. (6 R.R. at 29-32).

Officer Peg Jewel, with the Homicide division of the Houston Police Department, was involved in the investigation of the death of Y.T. Officer Jewel reviewed the interviews conducted by Officer Taylor and she attended the autopsy. Based on that information, Officer Jewel decided to continue the investigation into the child's death because the explanations given for how the injuries occurred were inconsistent with the injuries themselves. On June 27, 2012, Officer Jewel conducted further interviews of Ms. Tavarez and Mr. Teal. Ms. Tavarez and Mr. Teal came voluntarily to HPD headquarters to be interviewed. Officer Jewel described Ms. Tavarez as cooperative and friendly, but with a flat affect. (6 R.R. at 54-68).

The first statement that Ms. Tavarez gave was inadvertently unrecorded so she voluntarily gave a second statement. The two interviews were very similar. After the second interview, both Ms. Tavarez and Mr. Teal were allowed to leave the station. (6 R.R. at 85-89). There was no further action taken in this case until February, 2014, when Mr. Teal came to the District Attorney's Office with his daughter and Ms. Tavarez' older daughter. Separate interviews of Mr. Teal and Ms. Tavarez' older daughter were conducted at the District Attorney's Office. (6 R.R. at 90-93).

Mr. Marc Teal testified at trial that he met Ms. Tavarez around October, 2011, when he was working as a recruiter for a staffing company and she came in seeking employment. About one month after they met, they began to date and about three months later, Ms. Tavarez moved in with him. Ms. Tavarez' four children moved in with him as well. At that time, the children ranged in age from about thirteen (13) months to seven (7) years of age. Y.T. was the youngest and A.T. was the oldest. Ms. Tavarez did not work outside of the house at that time. Mr. Teal supported Ms. Tavarez and her family by working long hours at a temporary agency as a recruiter. (7 R.R. at 5-12).

Mr. Teal was rarely alone with Ms. Tavarez' children and he did not believe it was his responsibility to discipline them. Although his work schedule kept him busy, they did occasionally go out without the children. When they went out, Ms. Tavarez' sister would baby-sit. On the Friday evening before Father's Day, 2012, the children went to their aunt's house for a party. After she dropped the children off that day, Ms. Tavarez picked him up at work. They did not pick the children up again until almost midnight that night, but they remained nearby in anticipation of being called to get them. While they waited to pick up the kids, they ate at Waffle House and went to Wal-Mart. When they finally picked them up, the kids were sleepy, but they seemed otherwise fine. (7 R.R. at 13-17).

The following day, they went to a barbecue at one of Mr. Teal's friend's house. The kids played outside and they seemed happy and healthy. On Sunday, Mr. Teal

13

wanted to rest so Ms. Tavarez took the children to her parents' house, but he stayed home. Ms. Tavarez and her children returned home in time for dinner. The children, including Y.T., seemed fine. Mr. Teal left for work around 4:00 in the morning the following Monday and returned home around 2:00 in the afternoon. When he returned home, Y.T. was taking a nap. Ms. Tavarez went to the store and he remained home with her children. Ms. Tavarez was only gone about thirty-minutes and when she returned home from the store, he went back to work. Mr. Teal returned home from work around 4:30 that afternoon. When he arrived, Ms. Tavarez was asleep on the couch in the living room and Y.T. was asleep in a bedroom. The three older children were playing with water guns in the house. He helped them refill the water guns and took them outside to play. (7 R.R. at 17-30).

While he was outside playing with the two boys, A.T. told him there was something wrong with Y.T.. He rounded up the boys and walked toward the front door. Ms. Tavarez was standing at the door holding Y.T. and patting her. Y.T. seemed overheated and unable to fully wake from sleep. Mr. Teal suggested giving her some Powerade, but Ms. Tavarez thought she might be having a seizure. Y.T. vomited up a brown substance all over them. They washed her off in the shower and decided to take her to the hospital. He and Ms. Tavarez loaded all of the children into the car and took Y.T. to Bayshore Hospital. After Mr. Teal dropped Ms. Tavarez and Y.T. off at the hospital and he took the other three children to their aunt's house nearby. (7 R.R. at 30-37).

14

Mr. Teal returned to the hospital and learned a CAT scan had revealed that Y.T. suffered a skull fracture and was going to be transferred to Children's Memorial Hermann Hospital by Life Flight. Mr. Teal and Ms. Tavarez drove to the hospital together. Mr. Teal remained at the hospital until late that Monday, but he returned to work the following Tuesday. At some point that Tuesday, he met Ms. Tavarez and Officer Taylor at his house. After another patrol officer arrived, Officer Taylor performed a walk-through of his house. During the walk-through, Ms. Tavarez pointed out a door frame and indicated that Y.T. had hit her head there a few days prior. Mr. Teal gave Officer Taylor a brief statement after the walk-through. (7 R.R. at 38-41).

A few days later, Mr. Teal went with Officer Peg Jewel to HPD headquarters to give another statement. At some point during his statement he became ill and had to go the restroom where he threw-up. He left HPD headquarters about twenty minutes later by himself because he needed some space to process what was happening. Ms. Tavarez went to her sister's apartment. Later that night, he went to her sister's apartment as well. There were several family members there. Although Ms. Tavarez lived with her sister for a while, he continued to date her and he eventually asked her to marry him. (7 R.R. at 42-47).

Sergeant J.C. Padilla, with the Houston Police Department, was a detective in the homicide division in June of 2012 when he was assigned to investigate the death of Y.T. First, he and detective Mike Miller met with Officer Taylor about the extent of

15

her investigation. Then, they interviewed Ms. Tavarez' sister, Maria Tavarez, at her residence. A few days later, he interviewed Ms. Tavarez at HPD headquarters. Before he interviewed her, Officer Peg Jewel interviewed her. Sergeant Padilla did not record his interview of Ms. Tavarez because he didn't want to intimidate her. Ms. Tavarez was polite and cooperative. At times, she was emotional, but he encouraged her to be truthful. Ms. Tavarez did not admit to knowing anything that may have caused Y.T.'s injuries. (7 R.R. at 89-108).

Dr. Sara Doyle, with the Harris County Institute of Forensic Sciences, did not perform the autopsy on Y.T., but she reviewed her case in order to testify at trial. Based on her review of the autopsy report, Dr. Doyle testified that Y.T. had a contusion on the right side of her forehead and multiple bruises on the left side of her head in the temple area and in front of her left ear. (7 R.R. at 127-137). Y.T. had three scars over her right cheek and multiple irregular scars on the surface of her arms. She had two scars on the front of her left leg one scar on the front of her right leg. Tissue samples taken of the bruises indicated that they were approximately two days old. (7 R.R. at 138-146).

The internal evaluation revealed that Y.T. had multiple skull fractures. Some of the skull fractures were acute, meaning that they had not yet begun to heal, while others were resolving, meaning that they had begun to heal. The set of fractures to the back of the head appeared to be resolving while the acute fracture, a basilar skull fracture, extended forward from that same area to the middle portion of the skull. According to

16

Dr. Doyle, a fracture through the basilar skull would require a significant amount of force. An examination of her brain revealed multiple hemorrhages to the external surface surrounding the brain in the areas where the skull fractures were as well as bleeding on the inside of the tissue surrounding the brain and bleeding of the brain tissue itself. Some of the injuries were consistent with the two-day time frame and others appeared several days older. (7 R.R. at 147-156). Dr. Doyle could not determine how the injuries were caused, but she concluded that the injuries Y.T. suffered were consistent with the back of her head being hit against a blunt object and that the cause of death was blunt trauma with skull fractures and subdural hemorrhage. The manner of death was deemed homicide. (7 R.R. at 164-168).

## SUMMARY OF THE ARGUMENT

In her first issue, Ms. Tavarez argues that her conviction should be reversed because the State's evidence was legally insufficient to support a verdict of felony murder. The evidence failed to establish beyond a reasonable doubt that Ms. Tavarez committed the conduct alleged in the indictment and caused the death of the complainant.

In her second issue, Ms. Tavarez argues that the trial court erred in denying her requested instruction with regard to the voluntariness of her statement because jurors could not believe beyond a reasonable doubt that the statement was voluntary after police interrogated her for nearly ten hours. Without the statement, there was no evidence to support a finding that Ms. Tavarez caused the death of the complainant.

17

# ISSUE ONE

THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW TO SUSTAIN MS. TAVAREZ' CONVICTION FOR THE OFFENSE OF FELONY MURDER WHERE THE EVIDENCE FAILED TO ESTABLISH THAT SHE CAUSED THE DEATH OF THE COMPLAINANT.

## Standard of Review

The Texas felony murder statute provides that a person commits the offense of felony murder if he "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." See Tex. Penal Code §19.02(b)(3). The State must therefore prove: (1) commission or the attempt to commit the underlying felony; (2) commission of an act clearly dangerous to human life; (3) the death of an individual; (4) causation (the dangerous act caused the death); and (5) proof that the commission of the dangerous act was "in the course of and in furtherance of …or in immediate flight from" the underlying felony. *Contreras v. State*, 312 S.W.3d 566, 584 (Tex. Crim. App. 2010) cert. denied, 131 S. Ct. 427 (2010)..

A person commits the felony offense of injury to a child if he intentionally, knowingly, recklessly, or with criminal negligence by act or omission causes serious bodily injury or injury to a child. Tex. Penal Code § 22.04.

Sufficiency of the evidence is measured by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979); "whether, after viewing

the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

In *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) *overruling Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996) the Texas Court of Criminal Appeals announced that the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. The Court noted that it bears emphasizing that a rigorous and proper application of the *Jackson v. Virginia* legal-sufficiency standard is as exacting a standard as any factual-sufficiency standard (especially one that is "barely distinguishable" or indistinguishable from a *Jackson v. Virginia* legal-sufficiency standard).

In her concurring opinion in *Brooks*, Judge Cochran noted that the *Jackson* Court stated the correct standard must incorporate the prosecution's burden of proof – beyond a reasonable doubt- in a due-process review. The Court noted that a reasonable doubt has often been described as one based on reason which arises from the evidence or lack thereof. A reasonable doubt might arise because the verdict is manifestly against the great weight and preponderance of the credible evidence or because there is nothing more than a mere scintilla of evidence to support some element of the offense. Judge Cochran, cited Black's Law Dictionary, which states that legal sufficiency of the evidence is a test of adequacy, not mere quantity. Sufficient evidence is "such evidence,

19

in character, weight, or amount, as will legally justify the judicial or official action demanded." Judge Cochran went on to state that in criminal cases, only that evidence which is sufficient in character, weight, and amount to justify a fact finder in concluding that every element of the offense has been proven beyond a reasonable doubt is adequate to support a conviction.

In the instant case, the evidence presented was insufficient to support the jury's necessary finding beyond a reasonable doubt that the death of Y.T was caused by Ms. Tavarez striking her with either her hand, striking her with a blunt object, or striking her against a blunt object. (C.R. at 9). Viewing the evidence in the light most favorable to the verdict, the evidence is far from sufficient to support a rational finding beyond a reasonable doubt that the death of Y.T. was caused in that manner. When the State alleges a specific cause of death, it must prove beyond a reasonable doubt that the act alleged did, in fact, cause the death. *Jackson v. State*, 652 S.W.2d 415, 419-420 (Tex. Crim. App. 1983)(The evidence was insufficient to support the allegation that the mother had caused the death "by striking the child on the head with her elbows"). Her, the jury's determination was irrational. In *Jackson*, the Court determined the State failed to prove that the elbow blows confessed to by the mother caused the hemorrhage which caused the child's death.

Ms. Tavarez first denied that she could have hurt her child, but after nearly nine hours of interrogation by law enforcement, she stated that she "must have done it" because she was the "only one there." Ms. Tavarez never mentioned Y.T. hitting her

20

head on a table, but Officer Peg Jewell suggested that scenario and told Ms. Tavarez that she must have snapped and hurt her baby. It is only then that Ms. Tavarez replied that she "snapped and hurt [her] baby." (State's Exhibit 19).

After describing the various injuries on Y.T., Dr. Sara Doyle, a forensic pathologist who reviewed the autopsy, testified that although she could not determine how the injuries were caused, she concluded that the injuries Y.T. suffered were consistent with the back of her head being hit against a blunt object and that the cause of death was blunt trauma with skull fractures and subdural hemorrhage. (7 R.R. at 164-168). The observations DR. Doyle are not conclusive enough to establish beyond a reasonable doubt that Y.T. died as a result of Ms. Tavarez banging her head against a table as alleged. At best, any conclusion that the death was caused by Ms. Tavarez hitting her head against a table or with her hand was speculation. Speculation does not equate to a finding beyond a reasonable doubt and Ms. Tavarez' conviction should be reversed and the judgment reformed to reflect an acquittal. *See Burks v. United States*, 437 U.S. 1 (1978); *Greene v. Massey*, 437 U.S. 19 (1978).

**ISSUE TWO**

THE TRIAL COURT ERRED IN FAILING TO INCLUDE A GENERAL VOLUNTARINESS INSTRUCTION IN THE JURY CHARGE AS REQUIRED BY TEX. CODE CRIM. PROC. ART. 38.22§6.

A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion. Tex. Code Crim. Proc. Art. 38.21. A defendant may claim that her

21

statement was not freely and voluntarily made and thus may not be considered against her under several theories: (1) Article 38.22, §6- general voluntariness; (2) *Miranda v. Arizona* as expanded in Article 38.22, §§2 and 3 (the Texas confession statute); or (3) the Due Process Clause. It may be voluntary under one, two or all three theories. *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008). Section 6 of Article 38.22 applies to both an accused's custodial and non-custodial statements. *Id*. at 171. Article 38.22 §6 provides that despite a finding by the trial court that a statement is voluntary "evidence pertaining to such matter may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof."

During the charge conference trial counsel specifically requested a general voluntariness instruction which the trial court denied. (8 R.R. at 137-138). Claims of involuntariness under Article 38.22 can be, but need not be, predicated on police overreaching, and they could involve the "sweeping inquiries into the state of mind of a criminal defendant who has confessed" found in Connelly that are not of themselves relevant to due process claims." *Oursbourn*, 259 S.W.3d at 172. While "article 38.22 is aimed at protecting suspects from police overreaching …Section 6 of that article may also be construed as protecting people from themselves because the focus is upon whether the defendant

22

voluntarily made the statement. Period." *Id.* A statement is rendered involuntary if by the coercive conduct of law enforcement a person's will is overborne and her capacity for self-determination critically impaired. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973); *Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997).

Entitlement to an instruction pursuant to article 38.22 §6 "does not require a factual dispute, and similarly, a defendant need not request the jury instruction." *Moore v. State*, No. 14-07-00366-CR, 2008 WL 4308424, 6 (Tex. App. –Houston [14th Dist.], Aug. 28, 2008 pet. dism. as untimely filed)(mem. op. not designated for publication). If a reasonable jury could find that the facts, disputed or undisputed, rendered her unable to make a voluntary statement, she is entitled to a general voluntariness instruction. *Oursbourn* at 176.

In this case, Ms. Tavarez raised the question of general voluntariness at the charge conference and counsel specifically argued that the statement was the result of prolonged questioning by police. (8 R.R. at 137-138). Because trial counsel objected to the exclusion of a general voluntariness instruction "reversal is required if the error is 'calculated to injure the rights of [the] defendant,'" meaning that there must be "some harm to the accused from the error." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Under this standard, any harm, regardless of degree, is sufficient to require reversal. *Id.* The actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and the weight of probative

23

evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole. *Id.*

The only evidence to support the verdict is the statement of Ms. Tavarez that was obtained after nearly ten hours of questioning by law enforcement; several hours of which was unrecorded. There was no portion of the instruction in the charge that could have corrected or ameliorated the lack of the general voluntariness instruction. *See Ngo v. State*, 175 S.W.3d 738, 752 (Tex. Crim. App. 2005). The charge was utterly silent on the voluntariness of Ms. Tavarez' statement.

Had the instruction not been refused, the jury would have been authorized to disregard Ms. Tavarez' statement if it felt it was involuntary. Because the instruction was absent, the jury was unaware it could find the statement to be involuntary of "of the effect of an involuntariness finding; that is, it was unaware that it could not consider the statement for any purpose if it found the statement to be involuntary. *Oursbourn v. State*, 288 S.W.3d 65, 70 (Tex. App. –Houston [1st dist.] 2009, no pet.). If the jury had been properly instructed and found the statement involuntary there was no evidence whatsoever to support the conviction. Because Ms. Tavarez suffered "some harm" from the trial court's refusal to include the instruction, this Court should reverse for a new trial.

## PRAYER

Ms. Tavarez asks this Court to reverse and order an acquittal as to the conviction for felony murder. In the alternative, Ms. Tavarez asks this Court to remand the case for a new trial.

Respectfully submitted,

Alexander Bunin
Chief Public Defender


*/s/ Daucie Schindler*
Daucie Schindler
State Bar No. 24013495
Public Defender's Office
Harris County, Texas
Assistant Public Defender
1201 Franklin, 13th Floor
Houston, Texas 77002
Daucie.Schindler@pdo.hctx.net
Tel: 713-274-6717
Fax: 713-368-9278

## CERTIFICATE OF COMPLIANCE

Pursuant to proposed Rule 9.4(i)(3), undersigned counsel certifies that this brief complies with the type-volume limitations of *Tex. R. App. Proc. 9.4(e)(i)*.

1. Exclusive of the portions exempted by *Tex. R. App. Proc. 9.4 (i)(1)*, this brief contains 6,165 words printed in a proportionally spaced typeface.

2. This brief is printed in a proportionally spaced, serif typeface using Garamond 14 point font in text and Garamond 13 point font in footnotes produced by Microsoft Word Software.

3. Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in *Tex. R. App. Proc. 9.4(j)*, may result in the Court's striking this brief and imposing sanctions against the person who signed it.

*/s/ Daucie Schindler*
DAUCIE SCHINDLER

**CERTIFICATE OF SERVICE**

I certify that on the 5th day of October, 2015, a copy of the foregoing instrument has been electronically served upon the Appellate Division of the Harris County District Attorney's Office.

*/s/ Daucie Schindler*
DAUCIE SCHINDLER