# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00049-CR

**Sergio Nava Sanchez, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 460TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-23-904063, THE HONORABLE SELENA ALVARENGA, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Sergio Nava Sanchez was convicted of continuous sexual abuse of a child and sentenced to seventy years' imprisonment. *See* Tex. Penal Code §§ 12.32, 21.02. The victim was C.A., who was the daughter of his girlfriend whom he had lived with for years.[1] In two issues on appeal, Sanchez contends that the trial court erred by denying his motion to suppress a recording of his interview with the police and that there was error in the jury charge because it did not include instructions on voluntariness pertaining to the interview. We will affirm the trial court's judgment of conviction.[2]

---

[1] Because the complainant was a minor when the alleged offenses occurred, we will refer to her by using a pseudonym and refer to her family members by their relationships to her. *See* Tex. R. App. P. 9.10 (defining sensitive information).

[2] In addition to the continuous-sexual-abuse charge, the indictment alleged seven counts of aggravated sexual assault of a child, five counts of indecency with a child, one count of sexual assault of a child, and one count of attempted sexual assault of a child. *See* Tex. Penal Code

**DISCUSSION**

**Suppression Ruling**

*Background*

C.A. moved out of the apartment where she had been living with Mother and Sanchez and reported to the police that Sanchez had been sexually abusing her for years. Shortly thereafter, the police began an investigation that resulted in Sanchez's arrest. Following Sanchez's arrest, the police drove him to the police station to see if he would agree to be interviewed. His exchange with the police was recorded. Before trial, Sanchez filed a motion to suppress the recording, and the trial court held a hearing to consider the motion. During the interview, both Officer Valentin De Los Santos and Sanchez spoke Spanish. A transcript of the interview was prepared for trial, translated into English, and admitted as an exhibit during the hearing. Sanchez did not argue to the trial court and does not argue on appeal that there were any problems with the translation or that Officer De Los Santos was not able to effectively communicate in Spanish.

At the hearing, Officer De Los Santos testified that he conducted a custodial interview of Sanchez after Sanchez was arrested and transported to jail. When describing his interaction with Sanchez, the officer stated that that he was in the room with Sanchez for four hours and fifteen minutes and that the length of the encounter was typical for child-abuse cases. Although the officer explained that there was one miscommunication during his encounter with

§§ 15.01, 21.11, 22.011, 22.021. During trial, the State waived two counts of aggravated sexual assault of a child and the count of sexual assault of a child. The jury charge instructed that if the jury found Sanchez guilty of continuous sexual abuse of a child, it did not need to consider any of the remaining charges except one count of indecency with a child by contact and the count of attempted sexual assault of a child. The jury found Sanchez guilty of continuous sexual abuse, indecency with a child by contact, and attempted sexual assault of a child. Prior to sentencing, the State abandoned the charges of indecency with a child and attempted sexual assault.

2

Sanchez in which Sanchez believed that he had been arrested as part of a different case, the officer testified that he was able to clear up the misunderstanding, that Sanchez understood what he was saying throughout the remainder of the exchange, that Sanchez responded appropriately to the questions that were being asked, that there was no indication that Sanchez did not understand the questions being asked, and that Sanchez never indicated that he did not want to talk or wanted to end the interview. The officer also recalled that he told Sanchez that he would be going to jail that day because he had been arrested and that Sanchez understood that he would be going to jail once his discussion with the police was over. Further, the officer stated that during the interview, he gave Sanchez water multiple times and took Sanchez to the restroom. Additionally, the officer related that he did not think Sanchez was intoxicated during the interview, that Sanchez did not have an odor of alcohol, and that Sanchez did not display any signs of intoxication.

Further, Officer De Los Santos related that approximately five minutes after starting to talk with Sanchez, he read to Sanchez the *Miranda* warnings printed on a card prepared by the Department. Next, the officer recalled that Sanchez said he understood his rights "perfectly" and signed the Spanish version of the card, indicating that he wanted to waive his rights.[3] The card was admitted as an exhibit, and it contained the *Miranda* warnings in English on one side and in Spanish on the other side. The English version provided as follows:

**MIRANDA WARNING**

1. You have the right to remain silent and not make any statement at all and that any statement you make may be used against you and probably will be used against you at your trial;

---

[3] Sanchez did not argue at trial and does not argue here that there were any issues with the language used in the Spanish version of the warning card.

2. Any statement you make may be used as evidence against you in court;

3. You have the right to have a lawyer present to advise you prior to and during any questioning;

4. If you are unable to employ a lawyer, you have the right to have a lawyer appointed to advise you prior to and during any questioning;

5. You have the right to terminate this interview at any time.

The warning card also reflects that Sanchez placed his initials on the signature block located under the portion of the card stating as follows: "I have received and understand the warning on the other side of this card. I agree to waive these rights and to make a statement."

During his cross-examination, Officer De Los Santos related that he read Sanchez his rights, asked Sanchez if he understood those rights, and then asked if Sanchez wanted to speak with him. Although the officer agreed that telling a suspect "if you want to speak to me, sign here" might not "allow a person to really contemplate" the decision, he asserted that type of exchange did not occur in this case. On redirect, he further related that before he read the rights to Sanchez, Sanchez had already communicated his desire to speak with the police.

Officer De Los Santos explained that there were three phases to his interaction with Sanchez: rapport building, interviewing, and interrogating. Regarding rapport building, the officer stated that this phase lasted for twenty or thirty minutes and that this was a normal amount of time. During this phase, the officer asked Sanchez background information and learned that Sanchez was from Mexico, had children living in Mexico, and worked in the construction industry. Concerning the interview portion, Officer De Los Santos stated that he asked Sanchez open-ended questions and that Sanchez confirmed some of the information that the officer had already learned through his investigation. Turning to the interrogation phase, Officer De Los Santos testified that he laid out the allegations against Sanchez. The officer

4

explained that after he finished questioning Sanchez, Sanchez waited in the room for someone to transport him to jail and slept in the room while he waited.

During the suppression hearing, an audio and video recording of the interview was admitted into evidence and played for the trial court. On the recording, Sanchez was brought to the interview room and sat in a chair before Officer De Los Santos entered the room. Throughout the interview, the officer spoke with Sanchez in a professional manner and did not threaten Sanchez. Although the officer approached Sanchez for a short period of time when pointing something out and when taking Sanchez to the restroom, the officer did not invade Sanchez's personal space. For most of the interview, the officer sat across a table from Sanchez. After Sanchez's chair was relocated when he moved around the interview room, the table no longer separated Sanchez and Officer De Los Santos, but the space between them remained the same. Further, the officer did not block the entrance to the room. The recording was approximately five-and-a-half hours long, staring around 7:30 p.m. and ending around 1:00 a.m. Additionally, the interview stopped about an hour before the end of the recording.

At the start of the interview, Officer De Los Santos introduced himself and told Sanchez that he was investigating a case involving Sanchez, and Sanchez was given a bottle of water to drink. Sanchez said that he wanted to know what was going on, had questions, and thought talking about what was going on "sounds perfect." In response to the officer's questions, Sanchez stated that he was born in 1981. The officer communicated that before they could start the interview, he had to read Sanchez his rights because Sanchez had been arrested. Sanchez responded, "I think that sounds perfect." Further, the officer related that the charges were about his having raped C.A., and Sanchez responded, "I understand." The officer asked Sanchez some more identifying and background questions, and Sanchez answered those

5

questions. When the officer explained to Sanchez that he would be going to jail that night, Sanchez stated that he wanted to get everything cleared up.

Officer De Los Santos read the *Miranda* rights from the card as listed above, and Sanchez said, "OK" after the officer finished. The officer asked Sanchez if he understood his rights, and Sanchez answered, "Perfectly." Then, the officer asked Sanchez if he wanted to talk, and Sanchez answered, "No, yes . . . [b]ecause I . . . I need all of this to get cleared up." The officer clarified, "So, in order to talk to me, [you] need to sign . . . this car[d]." Sanchez replied, "Where do I sign?" Sanchez appeared to sign after Officer De Los Santos explained that he needed to sign "where it says signature."

After communicating his desire to talk, Sanchez informed the officer that he came to the United States eight years before his arrest, that he was born in Mexico, and that he had children who lived in Mexico. Next, he related that he became involved with Mother when he moved to the United States and that Mother had three children at the time, including C.A. who was eight years old when he met Mother. Sanchez described various homes in Austin, Texas, where Mother, C.A., and he lived. According to Sanchez, they lived in a trailer home for a year, an apartment for three years, another apartment for a year and a half, and one more apartment where Mother and Sanchez were living at the time of his arrest. Sanchez stated that he shared a room with Mother and C.A. for some of the time that they all lived together, that C.A. moved out of the last apartment one year before the interview after they had a "misunderstanding," and that C.A. moved in with Father. Sanchez discussed how there had been other charges against him and discussed the allegations in that other case, but the officer informed Sanchez that he was being questioned about a new case involving allegations that he had sexually abused C.A. from the time that she was ten or eleven years old to when she moved out several years later. Sanchez

6

stated that he understood that he was being questioned as part of a different investigation. Sanchez denied having any inappropriate interactions with C.A. and stated that it would not have been possible for anything inappropriate to happen because Mother was always with him.

Then, Officer De Los Santos informed Sanchez about what C.A. claimed he had done. Specifically, the officer stated that C.A. alleged that the abuse started when they moved into the trailer and continued through the subsequent moves to the three apartments, that he inserted his fingers into her vagina twenty times, that he inserted his penis into her vagina and mouth, and that he made her touch his penis with her hands. The officer also explained that C.A. had submitted to a forensic exam and that the doctor found wounds inside C.A.'s vagina that were evidence of sexual abuse. Sanchez repeatedly denied touching C.A. inappropriately, said he would not have had an opportunity to engage in the alleged acts, and told the officer that he wanted to "clear up everything."

During the interview, Sanchez informed Officer De Los Santos that he needed to use the restroom. Although the officer initially stated that Sanchez could wait a minute and continued asking questions, the officer took Sanchez to the restroom approximately seven minutes later after asking a few more questions. After the break, Sanchez continued to deny engaging in inappropriate behavior with C.A. When Sanchez yawned during the interview on two separate occasions, Officer De Los Santos told him to stand up to help him wake up. Officer De Los Santos asked Sanchez if he wanted some coffee or water, and Sanchez asked for some water. Officer De Los Santos asked another officer to bring some water, and the other officer brought in a bottle.

Shortly thereafter, Officer De Los Santos asked Sanchez, "Would you like to have sex with [C.A.]?" Sanchez answered "no" to the question, and the officer asked, "So, then it was

7

a mistake?" Sanchez admitted, "It was a mistake. But I don't like to have sex with girls." The officer asked if Sanchez was ashamed, and he said he was and asked if Mother would be told about what he had done. Sanchez stated that he had sex with C.A. once and clarified that he meant penetrating C.A.'s vagina with his penis but continued to deny ever inserting his fingers into C.A.'s vagina. When describing the admitted incident, he said that it occurred while they lived in one of the apartments when Mother was at work. Sanchez said he removed C.A.'s shorts and knew C.A. wanted to have sex "[b]ecause she didn't . . . say anything to me" to stop him. Sanchez believed that C.A. did not have pubic hair at the time and that she was a virgin. Sanchez recalled that he ejaculated.

Next, Sanchez described two other incidents. According to Sanchez, C.A. masturbated in front of him during the first incident. Regarding the second one, Sanchez said C.A. put her hands on his penis and moved her hands until he ejaculated. Sanchez recalled that this incident happened about three months after the time he penetrated C.A.'s vagina with his penis and occurred in the same apartment as that incident.

Shortly after Sanchez discussed these events, Officer De Los Santos asked Sanchez if he wanted any more water and if he needed to use the restroom. Sanchez stated he did not want any water but did want to go to the restroom, and the officer took Sanchez to the restroom. A little while after the restroom break, the officer stopped the interview and told Sanchez that he would need to wait in the room for someone to come and take him to jail. The officer told Sanchez that he could sleep in the room while waiting to be transported to jail. Sanchez laid on the floor and fell asleep in the room waiting to be taken to jail.

After the recording was played and after Officer De Los Santos finished testifying, Sanchez argued to the trial court that he did not knowingly and voluntarily waive his

8

rights before making his statement to the police. When making this argument, Sanchez asserted that Officer De Los Santos's statement to him informing him of his rights and asking him to sign the document if he wanted to talk did not allow for sufficient time to reflect on the decision of whether to waive his rights. Further, he argued that instead the officer should have but did not specifically ask if he wanted to waive those rights before speaking with the officer. During the hearing, the trial court had an exchange with Sanchez in which the trial court explained that it would not accept a plea-bargain agreement if it was not finalized by a certain date, and Sanchez indicated that he did not understand. The trial court repeated the explanation with additional information, and Sanchez stated that he understood. Sanchez's lawyer argued to the trial court that the exchange demonstrated that Sanchez could not have understood what was happening during the interview or knowingly waived his rights and that, consequently, his statement was involuntary.[4]

The trial court denied the motion to suppress. When explaining its ruling, the trial court informed the parties that it had made the following determinations:

(1) The interaction was a custodial interrogation;

(2) Sanchez was properly admonished about his rights, including that he did not have to talk with the officer;

(3) Sanchez voluntarily waived his rights and decided to talk with the officer;

(4) Sanchez freely communicated with the officer, answered the officer's questions, and never indicated that he did not understand what was happening;

(5) The officer did not coerce Sanchez into answering his questions; and

(6) Sanchez freely and voluntarily made his statements to the officer.

---

[4] As set out later in the opinion, Sanchez testified at trial that he was intoxicated when he was interviewed by the police, but he did not testify or make any argument concerning his being intoxicated at the suppression hearing.

9

After the trial court made its ruling, the trial was held. Following his conviction, Sanchez filed this appeal, and in his first issue, he challenges the trial court's ruling on his suppression motion.

*Standard of Review and Governing Law*

Appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). Under that standard, the record is "viewed in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable disagreement.'" *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). In general, appellate courts apply a bifurcated standard, *Martin v. State*, 620 S.W.3d 749, 759 (Tex. Crim. App. 2021), in which they give almost total deference to the trial court's findings of fact and review de novo the application of the law to the facts, *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019). That same deferential standard applies to the trial court's determination of historical facts, even if that determination is based on a video recording admitted into evidence at a suppression hearing. *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013); *see State v. Garcia*, 569 S.W.3d 142, 149 (Tex. Crim. App. 2018) (noting that on matters of historical fact, trial judge is in better position than appellate court to settle disputes).

Moreover, courts "consider only the evidence adduced at the suppression hearing because the ruling was based on that evidence rather than evidence introduced later" unless "the suppression issue has been consensually relitigated by the parties during trial." *Herrera v. State*, 80 S.W.3d 283, 290-91 (Tex. App.—Texarkana 2002, pet. ref'd) (op. on reh'g). In addition, a

trial court's ruling on the motion will be upheld if it is correct under any theory of law applicable to the case regardless of whether the trial court based its ruling on that theory, but "a trial court's ruling will not be reversed based on a legal theory that the complaining party did not present to it." *Story*, 445 S.W.3d at 732.

The Fifth Amendment prohibits the government from compelling a criminal suspect to bear witness against himself. U.S. Const. amend. V; *Pecina v. State*, 361 S.W.3d 68, 74-75 (Tex. Crim. App. 2012). To protect that privilege, the Supreme Court established safeguards against self-incrimination in the inherently coercive atmosphere of custodial interrogations. *Pecina*, 361 S.W.3d at 75. Specifically, the Supreme Court has explained that a person who is questioned by the police after he is "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.* Only if the person voluntarily and intelligently waives his *Miranda* rights may his statement be introduced into evidence against him at trial. *Pecina*, 361 S.W.3d at 75.

Similar to the *Miranda* warnings listed above, article 38.22 of the Code of Criminal Procedure sets out warnings that must be provided before custodial interrogation begins as well as other requirements, *see* Tex. Code Crim. Proc. art. 38.22, and "precludes the use of statements that result from custodial interrogation absent compliance with [those] additional procedural safeguards," *Henson v. State*, 440 S.W.3d 732, 742 (Tex. App.—Austin 2013, no pet.). Article 38.21 provides that "[a] statement of an accused may be used in evidence against

11

him if it appears that the same was freely and voluntarily made without compulsion or persuasion." Tex. Code Crim. Proc. art. 38.21.

Regarding the dictates of *Miranda* and article 38.22, the Court of Criminal Appeals has held that "[t]here are two facets to any inquiry" regarding the adequacy of a waiver of an accused's rights:

> First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second the waiver must be made "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."

*Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011) (quoting *Ripkowski v. State*, 61 S.W.3d 378, 384 (Tex. Crim. App. 2001)). For a waiver of *Miranda* rights to be involuntary "there must be some element of official intimidation, coercion, or deception." *Id.* However, a claim that a waiver of the article 38.22 statutory rights is involuntary "need not be predicated on police overreaching." *Id.* at 352 (quoting *Oursbourn v. State*, 259 S.W.3d 159, 172 (Tex. Crim. App. 2008)). Such a claim of involuntariness can involve police overreaching but can also involve inquiries into the accused's state of mind. *Oursbourn*, 259 S.W.3d at 172; *see Leza*, 351 S.W.3d at 352 ("Circumstances unattributable to the police that nevertheless adversely impact an accused's ability to resist reasonable police entreaties to waive his statutory rights . . . are 'factors' in the voluntariness inquiry, though they 'are usually not enough, by themselves, to render a statement inadmissible under Article 38.22.'" (quoting *Oursbourn*, 259 S.W.3d at 173)).

The determination as to whether a statement was voluntarily made must be analyzed by examining the totality of the circumstances. *Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991); *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007); *see Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010) (explaining that evaluation of whether appellant

12

knowingly, intelligently, and voluntarily waived rights before giving statement utilizes "[t]he 'totality-of-the-circumstances approach' [that] requires the consideration of 'all the circumstances surrounding the interrogation,' including the defendant's experience, background, and conduct" (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979))). "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude" that the accused waived his rights. *Joseph*, 309 S.W.3d at 25 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Stated differently, if it is determined that a suspect's decision not to rely on his rights was uncoerced, that he always knew that he could request a lawyer and stand mute, and that he was aware that the State could use his statements to secure a conviction, the analysis is complete, and the waiver is valid as a matter of law. *Moran*, 475 U.S. at 422-23; *Cobb v. State*, 85 S.W.3d 258, 263 n.7 (Tex. Crim. App. 2002).

"The required order is to warn first, waive second, and confess third." *State v. Lujan*, 634 S.W.3d 862, 865 (Tex. Crim. App. 2021). "Merely giving the warnings is insufficient; the defendant must waive the rights they reference." *Id.* "[A]n express verbal statement from an accused that he waives his rights prior to giving the statement" is not required, and a waiver "may be inferred from actions and words of the person interrogated." *Barefield v. State*, 784 S.W.2d 38, 40-41 (Tex. Crim. App. 1989); *see also Leza*, 351 S.W.3d at 353-54 (explaining that waiver under article 38.22 may be "an implied waiver whenever the totality of the circumstances . . . supports it"). "The burden of proof regarding the waiver rests with the State; it must prove by a preponderance of the evidence a knowing, intelligent, and voluntary waiver." *Lujan*, 634 S.W.3d at 865.

13

Relevant factors to consider when determining whether a statement is voluntary include: whether the defendant was advised of his constitutional rights (given *Miranda* warnings or statutory warnings); the defendant's age, intelligence level, and education; the conditions under which the defendant was questioned—i.e., length of detention, duration of questioning, environment, and access to restroom facilities and food; physical or mental impairment of the defendant, such as intoxication, illness, the influence of medication or drugs, and mental impairment or other disabilities; and whether physical punishment for the failure to provide a statement, such as the deprivation of food or sleep, was used. *Work v. State*, No. 03-18-00815-CR, 2020 WL 7776389, at *19 (Tex. App.—Austin Dec. 31, 2020, no pet.) (mem. op., not designated for publication); *see Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Lopez v. State*, 610 S.W.3d 487, 496-97 (Tex. Crim. App. 2020); *Oursbourn*, 259 S.W.3d at 172-73. "[A] defendant's conduct—namely, willingly talking with investigators—can demonstrate a knowing, intelligent, and voluntary waiver" of his rights. *Joseph*, 309 S.W.3d at 25 n.7.

*Analysis*

In his first issue, Sanchez presents several sets of arguments asserting that the trial court should have granted his suppression motion because his statement was not knowingly and voluntarily made and because he did not knowingly and voluntarily waive his rights. First, Sanchez contends that the trial court was required to but did not make any express findings regarding his background, experience, or conduct when deciding whether he made his statement to the police voluntarily. Further, Sanchez suggests that the State presented no evidence regarding his background and that the evidence that was presented would only allow for the following inferences: (1) he "was an immigrant from Mexico who had been in the United States

14

about nine years at the time of the interview"; (2) "[h]e had insufficient command . . . of the English language"; (3) he "had little, if any, familiarity with the adversarial nature of the American criminal justice system"; and (4) he did "not know how to write or sign his name."

As an initial matter, we note that Sanchez did not argue to the trial court that the court should grant his motion because the State failed to present evidence regarding his background, experience, or conduct and because the evidence presented at the hearing supported the inferences set out above that Sanchez contends required suppression in this case. *See Story*, 445 S.W.3d at 732 (noting that trial court's ruling will not be reversed on legal theory not presented to trial court). In any event, after making his claim on appeal concerning the lack of findings, Sanchez admits that he "has been unable to find authority supporting a position that a trial court must make an explicit finding with respect to the accused's background, experience, and conduct."

Moreover, the case that he relies on does not mandate that any express findings be made and instead explained that in assessing the voluntariness of a *juvenile's* statement under the totality of the circumstances, courts should consider "the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare*, 442 U.S. at 725. Although trial courts should take into account similar considerations when deciding the voluntariness of a statement given by an adult, we cannot agree with Sanchez that the failure to make at the suppression hearing specific findings and conclusions concerning those factors constituted reversible error. *See State v. Terrazas*, 4 S.W.3d 720, 725-26 (Tex. Crim. App. 1999) (noting that appellate courts consider trial court's implied findings); *see also Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("The determination

15

of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.").

In any event, the evidence presented at the suppression hearing would have allowed the trial court to determine that those factors weighed in favor of a voluntariness determination. Sanchez stated during the interview that he was born in 1981, meaning that he was over forty years old at the time of the interview. Although Sanchez contends that he did not understand English, Officer De Los Santos spoke to Sanchez in Spanish, and the card listing the *Miranda* rights was written in English and Spanish. Further, Sanchez placed his initials in the signature block on the side of the card written in Spanish. As will be explored in more detail below, nothing in the recording of the interview or the testimony at the suppression hearing indicated that Sanchez did not understand what the officer said to him.

Additionally, Sanchez stated during the interview that he had been involved in another criminal case before this one, supporting an inference that he had some familiarity with the legal system. *Cf. Wells v. State*, No. 03-10-00365-CR, 2011 WL 1631767, at *4 (Tex. App.—Austin Apr. 21, 2011, pet. ref'd) (mem. op., not designated for publication) (noting in voluntariness of consent issue that defendant "was 41 years old and familiar with the legal system, having been arrested previously"). Moreover, we cannot agree with Sanchez's suggestion that the evidence from the suppression hearing compelled a conclusion that he was illiterate, but even if that were the case, "[t]he mere fact that appellant is uneducated and illiterate does not mean that he does not understand the nature of the rights he is waiving and cannot voluntarily give a confession." *Peacock v. State*, 819 S.W.2d 233, 235 (Tex. App.—Austin 1991, no pet.).

16

In another set of arguments, Sanchez concedes that Officer "De Los Santos appropriately informed [him] of the rights as read to him from the department-issued blue card." Further, Sanchez agrees that Officer "De Los Santos asked him if he understood, and [he] unequivocally stated he did." However, Sanchez emphasizes that Officer De Los Santos did not specifically ask if he wanted to "waive" his rights and testified at the suppression hearing that simply asking someone to sign a document if the person wants to talk to the police does not provide enough time to allow the person to reflect and make a knowing decision about waiving his rights. Further, Sanchez asserts that he did not otherwise indicate that he had a desire to talk to the police. Sanchez also highlights that the interview lasted approximately four hours and that Officer De Los Santos testified that the first portion of the interview was designed to build rapport. Building on those topics, Sanchez suggests that the length and structure of the interview supports a conclusion that his "statement was made under compulsion or persuasion" and should not have been admitted.

As set out earlier, an express waiver is not required, and courts may infer waiver from the actions and words of the person interviewed. *Barefield*, 784 S.W.2d at 40-41. In this case, Officer De Los Santos explained to Sanchez that he was under arrest and that the officer needed to read him his rights before questioning could begin. Sanchez communicated a desire to talk to get everything "cleared up." Officer De Los Santos read Sanchez his rights, and Sanchez said that he understood his rights "perfectly." The record supports the trial court's determination that Officer De Los Santos properly informed Sanchez about his rights. *See Miranda*, 384 U.S. at 444; Tex. Code Crim. Proc. art. 38.22.

After being informed, Sanchez again stated that he wanted to talk because he needed "all this to get cleared up." *See Joseph*, 309 S.W.3d at 25 & n.7 (noting that defendant's

17

willingness to talk to police can demonstrate knowing, voluntary, and intelligent waiver). Officer De Los Santos informed Sanchez that if he wanted to talk, he needed to sign the card, and Sanchez asked where he needed to sign. Sanchez then placed his initials in the signature block on the card under the line stating in Spanish that he had received and understood the warnings on the card and agreed to waive those rights and make a statement. *Cf. Ashcraft v. State*, 934 S.W.2d 727, 737 (Tex. App.—Corpus Christi-Edinburg 1996, pet. ref'd) (noting that although "defendant's signing of a prepared statement which included pre-printed averments indicating that the signer understood his rights and freely waived them is not determinative of the question of affirmative waiver, it is significant evidence").

Nothing in the record indicates that Sanchez did not understand the nature of his rights; on the contrary, he communicated that he understood the rights "perfectly," elected to talk to Officer De Los Santos, and provided appropriate answers to the officer's questions. *See Joseph*, 309 S.W.3d at 25 & n.7; *Work*, 2020 WL 7776389, at *20; *see also State v. Oliver*, 29 S.W.3d 190, 193 (Tex. App.—San Antonio 2000, pet. ref'd) (finding existence of waiver where defendant was informed of rights, indicated his understanding of them, and proceeded without hesitation to participate in interview). Although Officer De Los Santos testified that simply informing a suspect that he had to sign a form if he wanted to talk might not allow for enough time to contemplate the decision, the officer also explained that scenario did not occur in this case because Sanchez had already communicated his desire to talk to the police and because Sanchez expressed that he fully understood his rights.

As set out above, Sanchez relies on an exchange he had with the trial court at the suppression hearing in which he expressed his lack of understanding regarding the trial court's statement that it would not accept a plea agreement entered into after a certain date, and he

18

argues this exchange shows that he did not understand his rights or what was asked in the interview. However, we note that in the exchange he later indicated to the trial court that he understood what the trial court was saying when it provided more explanation. In addition, at the suppression hearing the trial court concluded that this exchange did not indicate that Sanchez did not understand his rights or the questions being asked during the interview and stated as follows: "Well, in this situation, he did say he did not understand. The Court repeated/rephrased what had [it] previously said, and he said he understood. With regards to the statement that he gave to the detective, at no point did he say, I do not understand." That determination is supported by the evidence from the suppression hearing, including the transcript and recording of the interview.

Although Officer De Los Santos informed Sanchez that he would be going to jail after the interview regardless of what Sanchez said because he had been arrested, the officer did not threaten Sanchez, attempt to physically intimidate him, block the entrance, or threaten to employ physical punishments to force Sanchez to speak. *See Work*, 2020 WL 7776389, at *19. Instead, the officer communicated to Sanchez in a civil tone and did not invade his personal space.

As pointed out by Sanchez, the interview lasted four-and-a-half hours, but Officer De Los Santos testified that the length of the interview was typical for this type of case. *See Pietrzak v. State*, No. 05-01-01687-CR, 2002 WL 31957883, at *6 (Tex. App.—Dallas Jan. 23, 2003, no pet.) (op., not designated for publication) (overruling challenge to denial of suppression motion in case involving sexual assault of child where defendant was interviewed for four hours). During that time, Sanchez was given water at the beginning of the interview, and Officer De Los Santos asked Sanchez if he wanted water more than once and arranged for another

19

officer to bring in water for Sanchez when Sanchez indicated he was thirsty. Even though Officer De Los Santos did not immediately take Sanchez to the restroom the first time when Sanchez asked and continued to ask questions, the officer did take Sanchez to the restroom after a brief delay, and Sanchez did not confess to any criminal conduct during that delay and continued answering the officer's questions when he returned from the break. Additionally, Officer De Los Santos asked Sanchez later in the interview if he needed to use the restroom again and took him to the restroom when Sanchez indicated that he did. *See id.*; *see also Fineron v. State*, 201 S.W.3d 361, 366 (Tex. App.—El Paso 2006, no pet.) (holding seven-hour interrogation not unreasonably long when appellant was given water and was allowed breaks, was offered food, and was offered cigarettes).

Although Sanchez yawned during the interview and although the interview lasted until approximately midnight, Sanchez did not ask to stop the interview, and Officer De Los Santos told Sanchez that he could stand up and move to help energize him. Moreover, Officer De Los Santos testified that Sanchez did not appear intoxicated and did not smell like alcohol. *See Leza*, 351 S.W.3d at 352-53 (noting that defendant did not seem intoxicated and appeared to be voluntarily cooperating); *see also Oursbourn*, 259 S.W.3d at 173 (explaining that "intoxication" is "usually not enough, by [itself], to render a statement inadmissible"). Sanchez did fall asleep in the interview room after the interview was over, but Officer De Los Santos told Sanchez that he was allowed to sleep in the room while waiting to be taken to jail. In the interview, Sanchez never asked for an attorney or indicated that he did not understand what the interview was about other than initially being confused about the reason he had been arrested. Further, Sanchez's answers followed logically from Officer De Los Santos's questions, and he was articulate and able to effectively communicate with the officer. *See Work*, 2020 WL

20

7776389, at *20. Accordingly, the record supports the trial court's finding that Sanchez never indicated that he did not understand what was happening in the interview.

Given the totality of the circumstances, we conclude that the trial court did not abuse its discretion by determining that Sanchez knowingly, intelligently, and voluntarily waived his rights before talking with the police, that he freely communicated with Officer De Los Santos and answered his questions during the interview, that Sanchez was not coerced into answering the questions, and that he freely and voluntarily made his statements to the officer. *Cf. Lopez*, 610 S.W.3d at 497 (determining that defendant voluntarily waived his rights where interview "lasted only about two hours and 15 minutes," where officers offered defendant water, and where he agreed to give statement, was Mirandized, waived his rights, and did not ask for attorney or seek to leave interview); *Fineron*, 201 S.W.3d at 366 (affirming ruling denying motion to suppress claiming confession was involuntary where interview was seven hours long; where defendant "was given water, was allowed breaks, was offered food, and was offered cigarettes"; and where defendant's claim that he was physically abused and could not read statement was contradicted by officer's testimony).

For these reasons, we conclude that the trial court did not abuse its discretion by denying Sanchez's motion to suppress and overrule his first issue on appeal.

**Jury Charge Instruction**

*Background*

After Sanchez's motion to suppress was denied by the trial court, a trial was held. During the trial, the State called multiple witnesses, including the following: C.A., Mother, C.A.'s oldest sister ("Oldest Sister") on Father's side of the family, C.A.'s second oldest sister

21

("Older Sister") on Father's side of the family, a police officer who testified as an outcry witness, a forensic interviewer who interviewed C.A., a sexual assault nurse examiner (SANE) who evaluated C.A., and Officer De Los Santos who interviewed Sanchez. In his case-in-chief, Sanchez elected to testify. The trial court admitted multiple exhibits, including the recording of the interview, the transcript of the interview, and the *Miranda* card that Sanchez initialed.

In her testimony, C.A. stated that Sanchez and Mother began dating when she was approximately eight years old, that Sanchez moved into a trailer home with Mother and her, that Sanchez slept in Mother's and her bedroom, that Mother worked at night, and that Sanchez would care for her when Mother worked. Next, C.A. testified that Sanchez asked her to play a game with him while Mother was working. Regarding what Sanchez had called a game, C.A. stated that Sanchez initially covered her eyes with his hands but that he later used one of his hands to place her hand on his penis, used one of his fingers on his other hand to touch her vagina, and told her not to tell anyone or he would hurt Mother or Father. Regarding another incident that occurred when she was eight while Mother was working, C.A. explained that Sanchez told her to get on the bed, moved his hand under her clothes, and inserted his finger into her vagina. C.A. recalled the incident as painful. C.A. related that during the same incident Sanchez moved her to the top of his lap, inserted his penis into her vagina, and moved her up and down until "white stuff" came "out of his penis." C.A. remembered that she was bleeding from her vagina afterwards and said the incident felt like something punching her from the inside.

Next, C.A. testified how she moved to a one-bedroom apartment with Mother, Sanchez, and other members of her family. While they lived at the apartment, Mother still worked nights, and Sanchez and she would sometimes go with Mother to her work to help Mother clean the offices. When Sanchez and C.A. were outside the office building and away

22

from Mother, Sanchez on more than two occasions inserted his penis into her vagina and stopped moving when "white stuff came out of his penis." Additionally, C.A. testified that Sanchez inserted his penis into her vagina while they were in one of the offices in the building where Mother worked and that this happened more than twice. C.A. recalled how her family moved to a two-bedroom apartment and that while she lived at that apartment, Sanchez grabbed her by the arms and started touching her breasts under her clothes before she was able to run from the room.

In her testimony, C.A. discussed how her family moved to another two-bedroom apartment. While living at that apartment, Mother continued to work at night. One night while Mother was gone, C.A. locked herself in one of the bedrooms. Sanchez tried to force his way into the bedroom and told C.A. that he would hurt one of her family members if she did not unlock the door. When C.A. unlocked the door and left the bedroom, Sanchez told her to take her clothes off, placed her on his lap, inserted his penis into her vagina, and moved her until "white stuff came out of his penis." C.A. remembered another incident in which she locked herself in the bedroom while Mother was out but in which Sanchez was able to unlock the bedroom door. During that incident, Sanchez inserted his penis into her vagina. Regarding the final incident, C.A. testified that it occurred when she was fourteen years old on a night that the family was celebrating Mother's birthday. After Mother fell asleep in the living room, Sanchez forcefully grabbed C.A. by her arms, pushed her to the side of a bed, told her he was "going to make [her] his again," ripped off her shirt, and tried to rip off her pants. Mother woke up, went to the bedroom, and saw Sanchez grabbing C.A. When Mother arrived, Sanchez let C.A. leave.

C.A. testified that following this last incident she told two of her siblings on Mother's side of the family that Sanchez hurt her and that one of her siblings called Father. Father told C.A. to move in with him, and she did three days later. After moving into Father's

23

home, she told one of her siblings on Father's side of the family that Sanchez had been sexually abusing her, and one of her family members called the police. C.A. discussed how she tried to kill herself after moving in with Father because of the pain she was feeling from the sexual abuse Sanchez had inflicted on her and how she was taken to a hospital. Further, she explained that she had considered committing suicide while living with Mother but felt she could not because she needed to protect her younger niece from Sanchez.

Oldest Sister testified that she remembered how C.A.'s demeanor changed when she turned eight years old and how she stopped playing and became more withdrawn. Further, Oldest Sister recalled that after C.A. moved in with Father, C.A. told her that Sanchez sexually abused her by inserting his penis into her vagina. After Oldest Sister finished her testimony, Older Sister testified that C.A.'s demeanor completely changed when she turned twelve and started wearing long clothes that hid her skin. Older Sister said C.A. stopped being playful and looked like she was not sleeping.

Mother explained in her testimony that she lived in a trailer for two years with C.A. and Sanchez when C.A. was nine or ten years old. Further, Mother testified that they moved to several apartments after moving out of the trailer. Mother testified that Sanchez would sometimes arrive home drunk. Additionally, she confirmed that she left C.A. in Sanchez's care when she worked at night and that C.A. and Sanchez would sometimes go with her to work. Further, Mother recalled that one night C.A. called out for help when she was fourteen years old, that Mother went to the bedroom to see what was wrong, that Sanchez was drunk and on the ground, and that C.A. was crying. C.A. told Mother that Sanchez had touched her and said she was pretty. Mother recalled that C.A. would tremble anytime she was near Sanchez after that event and moved in with Father a few days later.

24

The police officer who testified as an outcry witness explained that she responded to a 911 call from a children's hospital where C.A. was being treated. The officer recalled that C.A. was being treated for suicidal ideation. C.A. told the officer that Sanchez started vaginally raping her when she was ten years old and continued raping her until she was fourteen years old. C.A. told the officer that the sexual assaults first occurred when she was living in a trailer with Mother and Sanchez, that he touched her vagina with his hand before inserting his penis into her vagina, that the assault hurt, and that her vagina started bleeding. Further, C.A. informed the officer that Sanchez raped her ten to fifteen times while she lived at the trailer. Next, C.A. told the officer that Sanchez raped her twenty to twenty-five times after they moved to an apartment. Regarding an incident occurring at an apartment when she was thirteen or fourteen, C.A. related to the officer that Sanchez "grabbed her by the hair," "yanked her down to the bed," put his hand "on her neck," "pinned her down on the bed," "took off her pants and underwear," and vaginally raped her. C.A. related to the officer that she was concerned Sanchez might hurt her niece.

Later, the forensic interviewer testified that she interviewed C.A. when she was fifteen years old. According to the interviewer, C.A. described being sexually abused by Sanchez starting when she was ten years old. C.A. said the first time occurred in a trailer while Mother was at work, that Sanchez asked C.A. to play a game, that he placed her hand on his penis, that he touched her vagina with his hand and inserted his finger into her vagina, that it hurt, and that Sanchez threatened to hurt Mother if C.A. said anything. Regarding another incident at the trailer while Mother was at work, C.A. told the interviewer that Sanchez removed her pants and underwear and inserted his penis into her vagina. C.A. remembered the incident as being painful, said that she tried to get away, and related that Sanchez told her to keep moving

25

to get away because he "like[d] that." Additionally, C.A. explained that it "hurt a lot" and that something "white came out of his penis and onto her thigh."

Concerning another incident, C.A. told the interviewer that Sanchez made her touch his penis when she was ten or eleven, threatened to hurt Mother or her if she did not comply, and made her move her hand up and down until "something white came out of his penis." Regarding an incident when she was fourteen, C.A. informed the interviewer that she locked herself in a bedroom, that Sanchez was able to unlock the door, that he grabbed her, that he pushed her onto the bed, that he removed her clothes, that he inserted his penis into her vagina, and that "something white came out of his penis." C.A. recalled the incident as causing her a lot of pain. C.A. informed the interviewer that other incidents occurred as well when she was between ten and fourteen years old. When the interviewer asked questions about the other incidents, C.A. started crying, had a panic attack, and was "almost hyperventilating," and the interviewer felt she needed to end the interview at that point.

The SANE testified that she evaluated C.A. when she was fifteen years old but did not perform a physical exam. During the evaluation, C.A. related that she was having nightmares about being raped and that Sanchez raped her between the ages of ten and fourteen. C.A. described Sanchez's touching her vagina with his hands and his penis. Further, she recalled that the last incident occurred when she was fourteen.

During the trial, Officer De Los Santos testified that he was a Spanish instructor for the police academy as well as an officer, was assigned to a sex-abuse case pertaining to C.A., and arranged for C.A. to be given a forensic interview. Additionally, the officer admitted to having been trained in "tactics and techniques" for interviewing people and for moving discussions in interviews in certain directions. The officer explained that C.A.'s statements to

26

the investigating police officers, the SANE, and the forensic examiner were consistent with one another. Further, the officer related that he interviewed Sanchez after he was arrested.

Concerning the interview, Officer De Los Santos discussed the different phases of the interview as he did during the suppression hearing and explained that during the rapport phase, he could assess if an accused had a mental illness or was intoxicated. Additionally, he discussed how interviews in child-sex cases typically last around three to four hours and how Sanchez's four-hour interview was within the normal range. Further, the officer related that he read Sanchez his *Miranda* warnings, that Sanchez explained that he understood his rights "perfectly," and that Sanchez placed his initials on the back of the Spanish version of the card listing his rights. During his cross-examination, the officer agreed that he did not specifically ask Sanchez if he wanted to waive his rights and speak with him or ask questions about Sanchez's level of education at the beginning of their interaction. However, the officer stated that he was able to ascertain Sanchez's ability to understand and respond to questions as the interaction continued and that Sanchez responded affirmatively when asked if he wanted to speak with the officer.

When discussing Sanchez, Officer De Los Santos related that Sanchez never asked to stop the interview and never said that he did not understand what the officer was saying. The officer stated that there was no language barrier between Sanchez and him because he originally learned Spanish as a child, spoke Spanish in a prior job, and received a Spanish certification; the officer recalled that Sanchez provided appropriate answers to the questions asked. Although the officer agreed that Sanchez was confused at one point about what charge he had been arrested for, the officer recalled that Sanchez understood when the officer explained why he had been arrested. Further, the officer testified that Sanchez showed no signs of being

27

intoxicated, did not smell like alcohol, and appeared competent. Even though the officer stated that he asked Sanchez to stand because he appeared tired, that the interview ended at midnight, and that Sanchez fell asleep after the interview, he emphasized that Sanchez never asked to stop the interview, that Sanchez was able to answer questions correctly and provide pertinent details, that Sanchez could have stopped the interview at any point by saying he wanted to stop or asking for a lawyer, and that Sanchez never appeared too tired to continue.

In his testimony, Officer De Los Santos discussed how Sanchez described living in a trailer with Mother and C.A. when C.A. was eight years old, moving to a one-bedroom apartment with Mother and C.A., and moving to two subsequent two-bedroom apartments with Mother and C.A. According to the officer, Sanchez stated that Mother worked at night but initially denied ever being alone with C.A.; however, the officer recalled that about an hour into the interview phase, Sanchez admitted that he had been alone with and cared for C.A. while Mother was working. Further, the officer testified that Sanchez's being deceptive and changing his story about whether he could have ever been alone with C.A. made the officer believe that he should interrogate Sanchez about the allegations. The officer agreed that Sanchez denied the allegations multiple times during the interview and that the officer had not accepted those denials, but the officer also testified that Sanchez often provided no response or objection when he was accused of sexually abusing C.A.

When describing the interrogation phase, Officer De Los Santos explained that he lied to Sanchez when he told Sanchez that the forensic exam showed that C.A. had been raped. Further, the officer stated that later in the interrogation Sanchez started making gradual admissions before ultimately admitting that he had sexual intercourse with C.A. one time and that once three months later he had made C.A. use her hands to touch his penis and sexually

28

pleasure him to the point of ejaculation. The officer recalled that Sanchez stated the events occurred at night. Moreover, the officer related that based on Sanchez's admission that two sex acts occurred in the first apartment where he lived with Mother and C.A., C.A. would have been nine or ten years old during those incidents. The officer recalled that Sanchez asked to use the restroom and that he told Sanchez to wait a moment so they could finish a line of questioning.

During his case-in-chief, Sanchez testified that he was originally from Mexico but had been in the United States for ten years working in the construction industry. Further, he recalled that C.A. was about seven years old when he first met her. Sanchez denied engaging in any sexual activity with C.A. and stated that he did not remember portions of the interview, including the portion where he admitted to abusing C.A. Additionally, Sanchez stated that he was drunk and tired on the day of the interview, that he was drunk all the time around the date of the interview, and that he would regularly drink twenty-four beers a day.

When discussing why he confessed, Sanchez stated that he was afraid of the allegations and the police and that Officer De Los Santos had asked him when he went to the restroom if he knew what happens to people in prison who are accused of these types of crimes. Sanchez explained that he also confessed because he knew that C.A. and her adult half-brother on Mother's side of the family were having a sexual relationship. Sanchez stated that he lied and confessed to being the one having sex with C.A. to protect Mother and C.A.'s brother from the consequences of the truth. Sanchez insisted that he had been willing to give up his life to protect Mother and C.A.'s brother. Moreover, Sanchez testified that before the interview he told Mother about the relationship between C.A. and her brother and that Mother agreed to talk with them, but Sanchez related that C.A. and her brother continued to have a sexual relationship until C.A. moved out of the apartment. Further, Sanchez asserted that C.A. made up the allegations against

29

him because it was easier to blame him than to blame her brother. Sanchez recalled trying to tell Officer De Los Santos about C.A.'s brother but said that the officer did not let him talk much and was pressuring him to confess.

After considering the evidence presented at trial, the jury found Sanchez guilty of continuous sexual abuse of a child.

*Analysis*

In his second issue on appeal, Sanchez contends that the trial court should have included in the jury charge instructions regarding the voluntariness of his statement to the police. When making this assertion, Sanchez notes that the police interview was over four hours in length and that he repeatedly denied committing any of the alleged offenses during the first portion of the interview. Next, Sanchez highlights that Officer De Los Santos described interview training he had received and that the officer admitted that he lied to Sanchez about the evidence the police had been able to obtain. Sanchez also emphasizes portions of the officer's testimony at trial in which he agreed that he did not ask if Sanchez wanted to exercise or waive his rights and did not inquire into Sanchez's level of education. Additionally, the officer testified that Sanchez appeared tired, that the interview ended around midnight, that he did not accept Sanchez's multiple denials, and that Sanchez slept after the interview. Further, Sanchez testified that he was afraid of the police, felt pressured to confess, did not remember parts of the interview, was drunk during the interview, and was tired during the interview. After emphasizing portions of the evidence at trial, Sanchez concedes that he did not request an instruction on voluntariness; however, he contends that based on the preceding, the trial court

should have sua sponte provided an instruction asking the jury to consider whether his statement to the police was given voluntarily and whether he voluntarily waived his rights.

When addressing an issue regarding an alleged jury-charge error, appellate courts must first decide whether there was error before addressing whether the alleged error resulted in any harm. *See Thanh Cuong Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). A trial court is statutorily obligated to instruct the jury on the "law applicable to the case." *See* Tex. Code Crim. Proc. art. 36.14; *Mendez v. State*, 545 S.W.3d 548, 551-52 (Tex. Crim. App. 2018); *see also Oursbourn*, 259 S.W.3d at 175-81 (explaining circumstances under which various voluntariness issues become "the law applicable to the case"). The trial court's duty to instruct the jury on the "law applicable to the case" exists even when defense counsel fails to object to inclusions or exclusions in the charge. *Mendez*, 545 S.W.3d at 552; *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013). The trial court is "ultimately responsible for the accuracy of the jury charge and accompanying instructions." *Mendez*, 545 S.W.3d at 552 (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)).

"A defendant may claim that his statement was not freely and voluntarily made and thus may not be used as evidence against him under several different theories: (1) Article 38.22, § 6—general voluntariness; (2) *Miranda v. Arizona* as expanded in Article 38.22, §§ 2 and 3 (the Texas confession statute); or (3) the Due Process Clause." *Oursbourn*, 259 S.W.3d at 169 (footnote omitted). The instruction pertaining to the second category arises under section 7 of article 38.22. Tex. Code Crim. Proc. art. 38.22, §§ 2, 3, 7; *Oursbourn*, 259 S.W.3d at 173, 176. A statement "may be involuntary under one, two, or all three theories. . . . The theory of involuntariness determines whether and what type of an instruction may be appropriate." *Oursbourn*, 259 S.W.3d at 169. "Thus, the first step in deciding upon an appropriate jury

31

instruction is identifying the theory of involuntariness." *Id.* In this issue, Sanchez argues he was entitled to instructions under sections 6 and 7 of article 38.22.

Article 38.22 sets out the circumstances in which statements by an accused may be used at trial. Tex. Code Crim. Proc. art. 38.22. Section 2 sets out warnings similar to the *Miranda* warnings that must be provided to an accused before his statement resulting from "custodial interrogation" can be admitted. *Id.* art. 38.22, § 2. Section 3 pertains to oral statements made by an accused "as a result of custodial interrogation" and provides that a statement is admissible only if certain requirements are met, including that "the accused is given the warning . . . of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning." *Id.* art. 38.22, § 3. Section 7 provides that "[w]hen the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement," *id.* art. 38.22, § 7, and the Court of Criminal Appeals has interpreted the phrase "the issue" from section 7 as "refer[ring] to compliance with the statutory warnings set out in . . . [arts.] 38.22, §§ 2 & 3, and the voluntariness of the defendant's waiver of the rights," *Oursbourn*, 259 S.W.3d at 176. For the issue "to be 'raised by the evidence' there must be a genuine factual dispute." *Id.*

Article 38.22 also contains another provision—section 6—that pertains to an accused's custodial and non-custodial statements because it only allows voluntary statements to be admitted. *Id.* at 171. That provision applies "[i]n all cases where a question is raised as to the voluntariness of a statement of an accused" and requires the trial court to make "an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions." Tex. Code Crim. Proc. art. 38.22, § 6. "Upon the finding by the judge as a matter of law and fact that the statement was voluntarily made, evidence pertaining to such matter

32

may be submitted to the jury and it shall be instructed that unless the jury believes beyond a reasonable doubt that the statement was voluntarily made, the jury shall not consider such statement for any purpose nor any evidence obtained as a result thereof." *Id.*

In contrast to voluntariness claims involving due process, which involve an objective assessment of police behavior and generally do not inquire into the state of mind of the defendant, voluntariness claims under article 38.22 can consider an assessment of the defendant's state of mind as well as "police overreaching." *Oursbourn*, 259 S.W.3d at 171, 172. In other words, article 38.22 "may also be considered as protecting people from themselves because the focus is upon whether the defendant voluntarily made the statement." *Id.* "A confession given under the duress of hallucinations, illness, medications, or even a private threat, for example, could be involuntary under" article 38.22. *Id.* (footnote omitted). "[F]act scenarios that can raise a state-law claim of involuntariness (even though they do not raise a federal constitutional claim) include the following: [] the suspect was ill and on medication," "the suspect 'lacked the mental capacity to understand his rights'[, and] [] the suspect was intoxicated, and he 'did not know what he was signing and thought it was an accident report.'" *Id.* at 172-73 (quoting *Rogers v. State*, 549 S.W.2d 726, 729-30 (Tex. Crim. App. 1977), and *Ritchie v. State*, 296 S.W.2d 551, 554 (Tex. Crim. App. 1956)). "Although youth, intoxication, . . . and other disabilities are usually not enough, by themselves, to render a statement inadmissible under Article 38.22, they are factors that a jury, armed with a proper instruction, is entitled to consider." *Id.* at 173.

Jury instructions related to confessions under sections 6 and 7 are "general" instructions that "set out the pertinent law and legal requirements." *Id.* at 173, 176. If "no 'reasonable jury could find that the facts, disputed or undisputed, rendered [a defendant] unable

33

to make a voluntary statement,'" then a defendant is not entitled to an instruction. *Estrada v. State*, 313 S.W.3d 274, 300 (Tex. Crim. App. 2010) (quoting *Oursbourn*, 259 S.W.3d at 176).

In this case, the evidence presented at trial demonstrated that Sanchez was under arrest when he gave his recorded statement to the police. Although Officer De Los Santos testified that Sanchez did not appear to be intoxicated and did not smell like alcohol, Sanchez testified that he was drunk during the interview, often drank twenty-four beers in a day during that time period, and did not remember portions of the interview. Mother testified that Sanchez would arrive at their home drunk and that he was drunk on the night that C.A. called for help. Additionally, the recording showed that Sanchez yawned and exhibited signs of being tired during the interview and that he fell asleep in the interview room after the interview concluded. In light of this evidence potentially indicating Sanchez's intoxication, "[v]oluntariness . . . became law applicable to the case," and Sanchez "was entitled to a voluntariness instruction as to Section 6 and 7" of article 38.22. *See Day v. State*, 696 S.W.3d 720, 737 (Tex. App.—San Antonio 2024, pet. ref'd); *see also Contreras v. State*, 312 S.W.3d 566, 576 (Tex. Crim. App. 2010) (noting that appellate court must view evidence in light most favorable to voluntariness defensive instruction); *Morales v. State*, 371 S.W.3d 576, 580, 586-87 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (determining that general voluntariness instruction did not become law applicable to case and noting, among other things, that defendant did "not point to any evidence suggesting that he was intoxicated").

However, as set out above, Sanchez did not request instructions on voluntariness under sections 6 or 7.[5] The amount of harm needed for a reversal for a jury-charge issue depends

---

[5] In its brief, the State suggests that this Court should overrule Sanchez's issue because he did not comply with the procedural requirements of article 38.22 providing that the issue of the

on whether a complaint regarding "that error was preserved in the trial court." *Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd). If no objection was made, as in this case, a reversal is warranted only if the error "resulted in 'egregious harm,'" *see Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008) (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)), meaning that the error "created such harm that the appellant was deprived of a fair and impartial trial," *Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019).

"Egregious harm is a difficult standard to meet." *Sandoval v. State*, 665 S.W.3d 496, 528 (Tex. Crim. App. 2022) (quoting *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016)). To determine if the jury charge egregiously harmed the defendant, reviewing courts "consider: (1) the jury charge as a whole, (2) the arguments of counsel, (3) the entirety of the evidence, and (4) other relevant factors present in the record." *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). When examining the evidence, appellate courts consider "the plausibility of the evidence raising the defense." *Lozano v. State*, 636 S.W.3d 25, 29 (Tex. Crim.

---

voluntariness of a statement must be "raised." Tex. Code Crim. Proc. art. 38.22, § 6. The State asserts that without a party raising the issue, there is no obligation on the part of the trial court to provide instructions under article 38.22. Although the State points to cases from our sister courts of appeals suggesting that the duty to provide an instruction must be triggered, *see Chavez v. State*, No. 07-17-00004-CR, 2018 WL 5782886, at *3 (Tex. App.—Amarillo Nov. 2, 2018, no pet.) (mem. op., not designated for publication); *Smith v. State*, 532 S.W.3d 839, 844 (Tex. App.—Amarillo 2017, no pet.), governing case law directs that when a defendant fails to request an article 38.22 instruction, or fails to object to the lack of one, appellate courts consider the trial court's failure to instruct the jury pursuant to this article as a jury-charge error that may be addressed even though it was not preserved, *see Oursbourn v. State*, 259 S.W.3d 159, 174, 182 (Tex. Crim. App. 2008); *Madden v. State*, 242 S.W.3d 504, 513 (Tex. Crim. App. 2007); *see also Aldaba v. State*, 382 S.W.3d 424, 429 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (explaining that although "voluntariness" issue must be raised and that accused should request jury instruction that relates to theory of involuntariness, "any potential error in the charge is reviewed for egregious harm" even "if the accused fails to present a proposed jury instruction or fails to object to the lack of one").

App. 2021) (quoting *Villarreal v. State*, 453 S.W.3d 429, 436 (Tex. Crim. App. 2015)). "Egregious harm exists if the error affects the very basis of the defendant's case, deprives him of a valuable right, or vitally affects a defensive theory." *Id.* To determine whether there was egregious harm, we consider the impact of the omission of the voluntariness instruction, not the impact of the admission of the statement itself. *See Oursbourn*, 259 S.W.3d at 182 n.89; *see, e.g., Paz v. State*, 548 S.W.3d 778, 793 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd). For both the "some" harm standard and the "egregious" harm standard, "[t]he record must bear out that Appellant suffered actual harm, not theoretical harm, and neither party has burden to show harm." *Lozano*, 636 S.W.3d at 29; *see Reeves*, 420 S.W.3d at 816.

Jury Charge

When arguing that he was egregiously harmed, Sanchez correctly notes that the jury charge did not mention that the jury could consider the voluntariness of his statement. Given the absence of any reference to voluntariness, Sanchez argues that the jury had no basis to question the voluntariness of his statement or consider that in its deliberations.

Although the charge did not mention voluntariness or specifically authorize the jury to consider voluntariness, it did instruct the jury that it was the exclusive judge of the facts, the credibility of the witnesses, and the weight to give the evidence. *See Chavez v. State*, No. 07-17-00004-CR, 2018 WL 5782886, at *4 (Tex. App.—Amarillo Nov. 2, 2018, no pet.) (mem. op., not designated for publication). Based on this instruction, the jury should have understood that it was free to disregard the incriminatory statements made by Sanchez if it believed that the statements were false. *See id.* However, given the absence of any instruction on voluntariness, the entirety of the jury charge weighs slightly in favor of egregious harm.

36

State of the Evidence

On appeal, Sanchez emphasizes that there was no physical or scientific evidence in this case. Additionally, Sanchez notes that C.A.'s outcry was made years after "the initial offense." Sanchez contends that, as a result, the absence of an instruction on voluntariness allowing the jury to disregard his recorded statement weighs heavily in favor of a finding of egregious harm.[6]

For the offense of continuous sexual abuse of a minor, the uncorroborated testimony of the child victim is sufficient to convict the accused. *See* Tex. Code Crim. Proc. art. 38.07; *Wishert v. State*, 654 S.W.3d 317, 328 (Tex. App.—Eastland 2022, pet. ref'd). In this case, C.A. discussed multiple acts of sexual abuse occurring over the years while she lived with Sanchez and occurring when Mother was at work. More specifically, she testified that Sanchez inserted his penis into her vagina on multiple times over several years and forced her to place her hands on his penis and move her hands up and down. Those were the two types of acts that Sanchez admitted to during the interview. C.A. also testified regarding other incidents of abuse, including Sanchez's inserting his finger into her vagina. C.A.'s testimony regarding the types of abuse and where and when they occurred was consistent with statements that she made to the officer who visited her in the hospital, to the forensic interviewer, to the SANE, and to Oldest Sister who all testified at trial.

---

[6] In his brief, Sanchez theorizes that he "felt compelled to [testify] because of the absence of any other law on voluntariness" and that he might have decided not to testify if he had known beforehand that there would be a voluntariness instruction in the charge. However, nothing in the record supports either of those propositions. *See Lozano v. State*, 636 S.W.3d 25, 29 (Tex. Crim. App. 2021) (noting that for egregious harm to be shown there must be actual and not theoretical harm). Moreover, in deciding whether the state of the evidence supports a finding of egregious harm, we consider the evidence that was presented. *See id.*

Moreover, the evidence potentially indicating that Sanchez's statement was not voluntarily made was scant. *See Lozano*, 636 S.W.3d at 29 (requiring appellate court to assess "plausibility" of evidence pertaining to defensive instruction). In his testimony, Sanchez stated that he did not remember making the admissions during the interview, was afraid during the interview, was drunk during the interview, was prohibited from explaining what happened by Officer De Los Santos, and was pressured by the officer to say he was guilty. In addition, the recording of the interview shows that the interview lasted until around midnight, that Sanchez yawned several times, and that he fell asleep in the interview room. Moreover, as pointed out by Sanchez, Officer De Los Santos testified that he had received training in tactics to be used in interviews and in how to direct the interviewee to answer certain questions.

However, Officer De Los Santos testified that he read Sanchez his *Miranda* rights, that Sanchez stated that he understood his rights "perfectly," and that Sanchez placed his initials on the card, indicating his desire to speak with the police. Further, Officer De Los Santos testified that Sanchez never said during the interview that he wanted to stop the interview or that he did not understand; on the contrary, Officer De Los Santos related that Sanchez communicated a desire to discuss the matter, that Sanchez responded appropriately to the questions that were asked, that there was no language barrier because he spoke to Sanchez in Spanish, and that he had no concerns about Sanchez's competency. *Cf. Ashcraft*, 934 S.W.2d at 738 (concluding that defendant was not under duress when *Miranda* warnings were given and noting that defendant "joked with the officers, stated that he understood his rights, and was eager to talk about the burglaries"). Additionally, the officer explained that Sanchez did not seem intoxicated and did not smell like alcohol.

38

Officer De Los Santos's testimony was consistent with the recording of the interview and the accompanying transcript. Moreover, the recording showed that the officer sat opposite and separate from Sanchez, acted professionally, did not invade Sanchez's personal space, did not threaten Sanchez, and did not make any threatening gestures to Sanchez. *See Vasquez v. State*, 179 S.W.3d 646, 658 (Tex. App.—Austin 2005) (noting that "threats of violence" is one factor that weighs against voluntariness determination), *aff'd*, 225 S.W.3d 541 (Tex. Crim. App. 2007); *see also Waldron v. State*, No. 03-17-00065-CR, 2018 WL 700047, at *8 (Tex. App.—Austin Feb. 1, 2018, pet. ref'd) (mem. op., not designated for publication) (emphasizing officer's professional behavior and lack of threats and abusive language and how officer "sat across the room" from defendant).

Moreover, Officer De Los Santos testified that the four-hour interview was consistent with the length of other interviews pertaining to investigations for sex crimes involving minors. *Cf. Otis v. State*, No. 09-09-00140-CR, 2010 WL 1794932, at *6 (Tex. App.—Beaumont May 5, 2010, no pet.) (mem. op., not designated for publication) (determining that trial court did not err by failing to suppress three- or four-hour interview on voluntariness grounds). Additionally, on the recording, the officer encouraged Sanchez to move around to help him wake up, and prior to Sanchez falling asleep, the officer encouraged Sanchez to sleep in the interview room. Further, the officer provided Sanchez with water during the interview. Although the officer did not immediately let Sanchez go to the restroom when Sanchez first asked, he let Sanchez use the restroom a few minutes later and then later allowed him to go to the bathroom a second time. *Cf. Waldron*, 2018 WL 700047, at *8 (noting that officer allowed defendant to use restroom and asked if defendant wanted anything to eat).

Although Officer De Los Santos admitted that he lied to Sanchez about having medical evidence from the forensic exam indicating that C.A. had been sexually abused, nothing in the record indicates that the lie was designed to produce an untruthful confession or that Sanchez's will was overborne by the lie. *See Lugo v. State*, 299 S.W.3d 445, 450-51 (Tex. App.—Fort Worth 2009, pet. ref'd); *see also Mason v. State*, 116 S.W.3d 248, 259 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (concluding that officer's untrue statement that medical evidence showed child's vagina had been penetrated did not render defendant's "confession involuntary" and explaining that misstating strength of case has at most slight impact on defendant's free choice "of whether to confess"). On the contrary, Sanchez continued to deny any inappropriate behavior after the officer made the statement.

Even though Sanchez testified that Officer De Los Santos threatened him during a trip to the restroom, that exchange was not recorded. Moreover, Sanchez testified that the threat was about whether Sanchez understood what happens to individuals in prison who have been convicted of a sex offense involving a child. That type of threat would not have encouraged Sanchez to confess to the allegations in these circumstances. *See Lopez v. State*, 610 S.W.3d 487, 496 (Tex. Crim. App. 2020) (listing threats to defendant's family member as type of police threat that can be coercive); *see also Hicks v. Hepp*, 871 F.3d 513, 528-29 (7th Cir. 2017) (noting that alleged victim acted on behalf of police and called defendant without telling defendant that call was being recorded by police with purpose of getting defendant to admit on recording to sexually abusing victim and concluding that threats made by victim on phone call to encourage defendant to confess were coercive, including threats to kill defendant soon or tell police about abuse and warning that "a child molester . . . would not fare well in prison").

40

Given the strength of the evidence of Sanchez's guilt and the weakness of the evidence supporting his voluntariness claim, we conclude that the state of the evidence weighs against a finding of egregious harm. *Cf. Chavez*, 2018 WL 5782886, at *4 ("The evidence of Appellant's guilt was overwhelming even without his confession and we cannot say that the absence of a general voluntariness instruction affected the very basis of the case or vitally affected his defense at trial.").

Counsels' Arguments

In his brief, Sanchez notes that the State referenced in its closing arguments his recorded statement and the accompanying transcript multiple times and asserted that he confessed to having sex with C.A., and Sanchez argues that the State mentioned the details that he "went into in the confession." Further, Sanchez contends that the State summarized his interview with the police by stating that he did not answer some of the questions asked, changed his story, and made gradual admissions. For these reasons, Sanchez asserts that the arguments made by the State weigh in favor of egregious harm.

In its opening argument, the State did assert that Sanchez admitted to certain acts with C.A. during his recorded interview but did not discuss what the admissions were other than stating that Sanchez stated he made a mistake and was ashamed of it. Additionally, the State referenced the interview a few times in its closing argument by stating that Sanchez admitted that he "had sex with" C.A., referencing where in the transcript and in the recording that admission and the admission concerning C.A.'s hands being used to sexually stimulate Sanchez occurred, and talking about how Sanchez said in the interview he was ashamed. However, the State primarily relied on other evidence introduced during trial, including extensively detailing C.A.'s

41

testimony concerning multiple incidents and discussing how her testimony was consistent with the testimony from other witnesses. Moreover, in his closing argument, Sanchez encouraged the jury to review the recording, the accompanying transcript, and the demeanor of both Officer De Los Santos and Sanchez and argued that any "doubt about th[e] process" that resulted in his confession should result in the jury having reasonable doubt. Further, Sanchez emphasized that there was no physical evidence linking him to the charged offenses.

Because Sanchez was able to present his argument that irregularities in the interview process should result in the jury's having reasonable doubt and because of the State's focus on evidence other than the confession, we conclude that this factor does not weigh in favor of egregious harm. *See id.*

Other Relevant Considerations in the Record

When discussing this factor, Sanchez notes that he filed a pretrial motion to suppress his statement and contends that this shows that his defense that his confession was involuntary "was fundamental" to his case. Moreover, Sanchez discusses the language of general voluntariness instructions that could have been given under sections 6 and 7 of article 38.22 had the trial court decided to include them.[7]

---

[7] Sanchez also refers to a case by one of our sister courts of appeals, which determined that the lack of a general voluntariness instruction egregiously harmed the defendant. *See Oursbourn v. State*, 288 S.W.3d 65 (Tex. App.—Houston [1st Dist.] 2009, no pet.). However, the evidence in that case indicating that the defendant's statement was involuntary was stronger than the evidence in this case. *See id.* at 69-70 (noting that psychologist testified that defendant displayed symptoms of bipolar disorder during interview, that defendant's mother testified that defendant was "manic" on day of interview, that defendant had recently suffered head injury, and that defendant told officers that he was in pain during interview). Moreover, our sister court noted significant problems with the evidence pertaining to the defendant's guilt. *See id.* at 71 (setting out how witnesses identified people other than defendant as assailant, how defendant was not wearing gloves described by witnesses, and how main "direct evidence of appellant's

42

To the extent Sanchez suggests that his moving to suppress his statement bears on this analysis, we concluded in the prior issue that the trial court did not abuse its discretion by denying his motion. Moreover, we also note that although Sanchez's attorney did not discuss the issue in his closing argument, Sanchez in his testimony presented a defense explaining why he, according to him, falsely confessed to the police. Specifically, he extensively testified that C.A.'s adult half-brother was having sex with C.A. and that Sanchez falsely told the police he assaulted C.A. because he wanted to protect Mother and C.A.'s half-brother. *Cf. id.* (noting in analysis assessing harm from omission of voluntariness instruction that defendant testified at trial that his statement "was untrue"). Accordingly, we conclude that this factor does not weigh in favor of egregious harm.

Given our resolution of the factors above and "mindful the egregious harm standard is difficult to meet," we "cannot conclude that [Sanchez] suffered actual, egregious harm" by the trial court's failure to include voluntariness instructions in the jury charge. *See Day*, 696 S.W.3d at 740, 741.

For these reasons, we overrule Sanchez's second issue on appeal.

## CONCLUSION

Having overruled both of Sanchez's issues on appeal, we affirm the trial court's judgment of conviction.

---

guilt was his confession"). "In any event, cases from our sister courts of appeals are not binding precedent." *Sutton v. State*, 706 S.W.3d 482, 489 n.2 (Tex. App.—Austin 2024, no pet.).

_____

Karin Crump, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed:   July 11, 2025

Do Not Publish

44